NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 22-1222

―――――――――――――――

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――

AMERICAN PETROLEUM INSTITUTE, et al.,
*Petitioners*,

v.

U.S. DEPARTMENT OF THE INTERIOR, et al.,
*Respondents*.

―――――――――――――――

On Petition for Review Seeking to Compel Agency Action
by the U.S. Department of the Interior

―――――――――――――――

**BRIEF FOR RESPONDENTS**

―――――――――――――――

                                    TODD KIM
                                    *Assistant Attorney General*

                                    KEVIN W. McARDLE
                                    JUSTIN D. HEMINGER
Of Counsel:                         *Attorneys*
                                    Environment and Natural Resources
MELISSA A. HEARNE                   Division
CORY S. SPILLER                     U.S. Department of Justice
*Attorneys*                         Post Office Box 7415
Division of Mineral Resources       Washington, D.C. 20044
Office of the Solicitor             (202) 514-5442
U.S. Department of the Interior     justin.heminger@usdoj.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

All parties appearing in this Court are listed in the Opening Brief for Petitioners American Petroleum Institute, et al. (collectively, API). The Director of the Bureau of Ocean Energy Management, Elizabeth Klein, is automatically substituted for her predecessor in office under Fed. R. App. P. 43(c)(2).

**B.    Rulings Under Review**

API seeks this Court's review of the Department of the Interior's alleged "failure . . . to prepare and maintain a Five-Year Leasing Program for leasing federal oil and gas on the Outer Continental Shelf as required by the Outer Continental Shelf Lands Act." Petition for Review 2, ECF No. 1961095 (Aug. 26, 2022). Thus, no final agency action is under review in this case.

## C.    Related Cases

This case has not previously been before this Court. API's Opening Brief correctly identifies a case in which the Petitioner organizations asserted a similar claim, *American Petroleum Institute, et al. v. U.S. Department of the Interior, et al.*, No. 2:21-CV-2506 (W.D. La.).

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
        RELATED CASES ...............................................................i

TABLE OF CONTENTS ..............................................................iii

TABLE OF AUTHORITIES.........................................................vi

GLOSSARY ..............................................................................xiii

INTRODUCTION.........................................................................1

STATEMENT OF JURISDICTION...............................................3

STATEMENT OF THE ISSUES....................................................6

PERTINENT STATUTES.............................................................7

STATEMENT OF THE CASE ......................................................7

    A.    The Outer Continental Shelf Lands Act................................7

    B.    Factual background ..........................................................11

        1.    Interior starts developing a 2019-2024
              Program........................................................11

        2.    Interior starts developing a 2023-2028
              Program........................................................12

        3.    Timeline for completing the next Program ................15

        4.    The Inflation Reduction Act.......................................16

SUMMARY OF ARGUMENT ......................................................18

STANDARD OF REVIEW............................................................21

ARGUMENT ....................................................... 22

I.   API lacks standing. ........................................ 22

II.  Mandamus relief against Interior is unwarranted. ..................... 24

     A.   API seeks mandamus relief, so the *TRAC* factors
          provide the applicable standard ........................... 24

          1.   API seeks equitable relief that it should
               have sought in a writ of mandamus ........................... 25

          2.   The *TRAC* factors apply to API's claim ...................... 30

     B.   The *TRAC* factors weigh heavily against
          mandamus relief ................................................. 32

          1.   Interior's plan to approve the next Five-
               Year Program in December 2023 is within
               the rule of reason ........................................... 33

          2.   The statutory scheme confirms that Interior
               is acting within the rule of reason ........................... 42

          3.   Human health and welfare favor Interior's
               approach .................................................... 50

          4.   Interior has reasonably prioritized its
               activities and will continue to do so........................... 51

          5.   Expediting issuance of a Program would
               harm Interior and the public ............................ 52

          6.   Interior has acted in good faith in
               developing a Program ................................... 54

III. API lacks compelling equitable grounds for the
     mandamus relief it seeks ............................................. 56

CONCLUSION ............................................................. 61

CERTIFICATE OF COMPLIANCE.........................................................62

ADDENDUM ...................................................................................1

DECLARATION OF WALTER CRUICKSHANK ...................................1

# TABLE OF AUTHORITIES*

## Cases

*In re Am. Fed. of Gov't Employees, AFL-CIO,*
  837 F.2d 503 (D.C. Cir. 1988)........................................................58

*\*Am. Hosp. Ass'n v. Burwell,*
  812 F.3d 183 (D.C. Cir. 2016)...........6, 21, 22, 30, 31, 49, 55, 56, 57

*Amoco Prod. Co. v. Village of Gambell, AK,*
  480 U.S. 531 (1987) ......................................................................30

*API v. Interior,*
  No. 2:21-CV-02506, 2022 WL 16704444
  (W.D. La. Oct. 5, 2022) ...................................................................5

*API v. Interior,*
  No. 2:21-CV-02506, 2022 WL 167011791
  (W.D. La. Nov. 3, 2022) ..................................................................5

*Arizona v. Inter Tribal Council of Arizona, Inc.,*
  570 U.S. 1 (2013) ..........................................................................28

*\*In re Barr Labs., Inc.,*
  930 F.2d 72 (D.C. Cir. 1991) .................29, 30, 31, 32, 48, 54, 55, 56

*In re Bluewater Network,*
  234 F.3d 1305 (D.C. Cir. 2000)..........................................25, 28, 58

*California v. Watt,*
  668 F.2d 1290 (D.C. Cir. 1981)......................................................39

*California v. Watt,*
  712 F.2d 584 (D.C. Cir. 1983)........................................................39

---

\* Authorities on which we chiefly rely are marked with asterisks.

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ...................................................................... 29

*Cobell v. Norton,*
    240 F.3d 1081 (D.C. Cir. 2001) ...................................................... 29

*In re Core Commc'ns, Inc.,*
    531 F.3d 849 (D.C. Cir. 2008) ................................................. 25, 33

*CTIA-The Wireless Assn v. FCC,*
    530 F.3d 984 (D.C. Cir. 2008) ....................................................... 54

*In re Ctr. for Auto Safety,*
    793 F.2d 1346 (D.C. Cir. 1986) ..................................................... 59

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
    563 F.3d 466 (D.C. Cir. 2009) ............................................. 8, 39, 46

*Ctr. for Sustainable Econ. v. Jewell,*
    779 F.3d 588 (D.C. Cir. 2015) ........................................... 35, 39, 46

*Cutler v. Hayes,*
    818 F.2d 879 (D.C. Cir. 1987) ....................................................... 42

*Defenders of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013) ..................................................... 24

*Ecolift Corp. v. FAA,*
    No. 20-1136, 2020 WL 2611032 (D.C. Cir. 2020) .......................... 27

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................... 36

*Friends of the Earth v. Haaland,*
    583 F. Supp. 3d 113 (D.D.C. 2022)
    *appeals pending* Nos. 22-5036, 22-5037 (D.C. Cir.) ...................... 16

*Fund for Animals, Inc. v. Norton,*
    322 F.3d 728 (D.C. Cir. 2003) ................................................. 22, 23

*In re: GTE Service Corp.*,
    762 F.2d 1024 (D.C. Cir. 1985).....................................................26

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) ........................................................................22

*Jarkesy v. SEC*,
    803 F.3d 9 (D.C. Cir. 2015) ...........................................................32

*JTB Tools & Oilfield Servs., LLC v. United States*,
    831 F.3d 597 (5th Cir. 2016) ...........................................................5

*Latif v. Obama*,
    677 F.3d 1175 (D.C. Cir. 2012)...............................................54, 55

*League of Conservation Voters v. Trump*,
    363 F. Supp. 3d 1013 (D. Alaska 2019), *vacated and
    remanded*, 843 F. App'x 937 (9th Cir. 2021)..................................12

*Louisiana v. Biden*,
    No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022)
    *stay application denied by* 142 S. Ct. 2750 (2022).......................13, 14

*Louisiana v. Biden*,
    585 F. Supp. 3d 840 (W.D. La. 2022)..............................................13

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003)..........................................33, 34, 35

*In re Monroe Commc'ns Corp.*,
    840 F.2d 942 (D.C. Cir. 1988)........................................................50

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005).......................................................31

*In re Nat'l Nurses United*,
    47 F.4th 746 (D.C. Cir. 2022) ...............................................4, 25, 28

*NetCoalition v. SEC,*
    715 F.3d 342 (D.C. Cir. 2013)........................................................ 27

*Norton v. S. Utah Wilderness All.,*
    542 U.S. 55 (2004) (*SUWA*) ........................................................ 28

*NRDC v. Hodel,*
    865 F.2d 288 (D.C. Cir. 1988)........................................................ 39

*Oil, Chem. & Atomic Workers Int'l Union v. Zegeer,*
    768 F.2d 1480 (D.C. Cir. 1985)................................................ 42, 57

*Oryszak v. Sullivan,*
    576 F.3d 522 (D.C. Cir. 2009)........................................................ 5

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002)........................................................ 21

*Sherley v. Sebelius,*
    689 F.3d 776 (D.C. Cir. 2012)........................................................ 36

*Sierra Club v. Thomas,*
    828 F.2d 783 (D.C. Cir. 1987)................................................ 39, 53

*\*Telecomms. Research & Action Center v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) (*TRAC*) .............. 2, 3, 4, 5, 26, 27, 32,
    ................................................................ 33, 42, 50, 51, 54, 59

*Ukiah Adventist Hosp. v. FTC,*
    981 F.2d 543 (D.C. Cir. 1992)........................................................ 27

*In re United Mine Workers of Am. Int'l Union,*
    190 F.3d 545 (D.C. Cir. 1999)...................................... 39, 40, 51, 56

*United Steelworkers v. Rubber Mfrs. Ass'n,*
    783 F.2d 1117 (D.C. Cir. 1986)................................................ 38, 54

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ........................................................ 29

*W. Coal Traffic League v. STB,*
216 F.3d 1168 (D.C. Cir. 2000) ................................................. 31, 46

## Statutes

Administrative Procedure Act
5 U.S.C. § 703 ................................................................................. 5, 6

5 U.S.C. § 706(1) ................................................. 27, 28, 29, 31

All Writs Act
28 U.S.C. § 1651(a) ......................................... 4, 5, 6, 25, 26, 27, 28

Outer Continental Shelf Lands Act
43 U.S.C. § 1331(a) ...................................................................... 8

43 U.S.C. § 1332(3) ...................................................................... 8

43 U.S.C. § 1337 ........................................................................... 9

43 U.S.C. § 1340 ........................................................................... 9

43 U.S.C. § 1344 ................................................... 9, 43, 47, 48, 55

43 U.S.C. § 1344(a) ................. 3, 9, 19, 39, 42, 43, 44, 46, 47, 48, 59

43 U.S.C. § 1344(a)(1) ............................................................ 45, 51

43 U.S.C. § 1344(a)(2) ................................................................ 45

43 U.S.C. § 1344(a)(2)(G) ......................................................... 51

43 U.S.C. § 1344(a)(2)(H) ......................................................... 51

43 U.S.C. § 1344(a)(3) ............................................................ 45, 51

43 U.S.C. § 1344(a)(4) ................................................................ 45

43 U.S.C. § 1344(c) ................................................................ 9

43 U.S.C. § 1344(c)(2) ......................................................... 47

43 U.S.C. § 1344(d)(1) .......................................................... 9

43 U.S.C. § 1344(d)(2) ............................................ 10, 16, 41, 47

43 U.S.C. § 1344(e) ............................................................. 47

43 U.S.C. § 1349(c)(1) ......................................... 4, 6, 24, 26

43 U.S.C. § 1349(c)(4) ......................................................... 4, 6

43 U.S.C. § 1351 ................................................................... 9

43 U.S.C. § 1802(1) ............................................................. 48

43 U.S.C. § 1802(2) ...................................................... 48, 49

Inflation Reduction Act
Pub. L. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ........................... 17

Pub. L. 117-169, § 50264 ................................................. 49, 57, 60

Pub. L. 117-169, § 50264(b) ................................................ 17, 52

Pub. L. 117-169, § 50264(c) ................................................. 17, 52

Pub. L. 117-169, § 50264(d) ................................................ 17, 52

Pub. L. 117-169, § 50264(e) ................................................ 17, 52

Pub. L. 117-169, § 50265 ............................................. 17, 50, 57

## Regulations and Court Rules

82 Fed. Reg. 30,886 (July 3, 2017) ........................................................ 11

Fed. R. App. P. 15(a)(2)(C) ................................................................. 26

Fed. R. App. P. 21 ............................................................................. 26

D.C. Cir. R. 28(a)(7) ..................................................................... 22, 23

# GLOSSARY

API                    American Petroleum Institute

APA                    Administrative Procedure Act

EIS                    Environmental Impact Statement

NEPA                   National Environmental Policy Act

OCSLA                  Outer Continental Shelf Lands Act

## INTRODUCTION

The Outer Continental Shelf Lands Act (OCSLA) requires the Secretary for the U.S. Department of the Interior to prepare and maintain a program for oil and gas leasing on the Outer Continental Shelf. A program sets a five-year schedule for proposed lease sales (the Five-Year Program). Interior has issued Five-Year Programs for forty years. But the last few years have brought unprecedented challenges and setbacks, from changing presidential administrations with contrasting policies to adverse federal court decisions.

In June 2022, the 2017-2022 Program expired without a new Program in place. Days later, however, Interior took the third of five major steps to develop the next Program. And Interior is working diligently to complete the final two steps. Interior plans to approve the next Program in December 2023.

Dissatisfied with Interior's pace, Petitioners (API) request that the Court order Interior to approve the next Program by September 30, 2023. API has not met its burden to establish standing, and even if it had, the Court should reject that relief for two reasons.

*First*, API has not met the high bar for the relief it seeks. Although API filed this case as a petition for review, the relief that API seeks—compelling Interior to act by a specific date—is properly sought through a writ of mandamus. Mandamus relief is reserved for extraordinary situations because it requires the Court to intrude on the ordinary province of the Executive Branch. To obtain this drastic remedy, a petitioner must satisfy three threshold requirements, one of which is establishing a clear and indisputable right to relief. And in cases like this one, when a petitioner alleges that an agency has unlawfully delayed action, this Court applies the six "*TRAC* factors," from *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*). API has failed to show its entitlement to mandamus relief. Indeed, it has not even cited the *TRAC* factors, let alone explained how they would justify mandamus relief.

*Second*, even if API could show unlawful delay—it cannot—the Court should still deny the relief it requests. To grant mandamus relief against Interior, the Court would need to find *compelling equitable grounds*. But the equities here point in the opposite direction. In August 2022, in the Inflation Reduction Act, Congress stepped in to address the

2

gap between the 2017-2022 Program and the next Program, requiring Interior to move forward with certain lease sales on a prescribed timeline, without directing Interior to issue a new Program by a date certain. And Interior is proceeding expeditiously to approve the next Five-Year Program in December 2023, only three months after API's requested date. API has not provided compelling reasons why the Court should accelerate Interior's timeline. Mandamus relief should be denied.

## STATEMENT OF JURISDICTION

API has failed to meet its burden to show standing. *See below* Argument Point I.

The Court directed the parties to address its statutory subject matter jurisdiction over the Petition for Review. Order 1, ECF No. 1979345 (Dec. 28, 2022). API's sole claim is that Interior has failed to perform a nondiscretionary duty to timely issue the next Five-Year Program under 43 U.S.C. § 1344(a). API Br. 2. This Court has exclusive subject matter jurisdiction over that claim because resolution of the claim affects this Court's future jurisdiction to review the final Program. *See TRAC*, 750 F.2d at 75-79.

When a statute "commits review of agency action" to this Court, any suit seeking relief that "might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *TRAC*, 750 F.2d at 75. An exclusive judicial review provision, combined with the All Writs Act, 28 U.S.C. § 1651(a), gives this Court jurisdiction to resolve claims that protect its future jurisdiction. *TRAC*, 750 F.2d at 75. Although the All Writs Act does not grant jurisdiction, it authorizes this Court to issue a writ of mandamus "in aid of jurisdiction" that the Court "already has or will have as a result of issuing the writ." *In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022).

In OCSLA, Congress committed review of the Secretary's *approval* of the Five-Year Program exclusively to this Court. 43 U.S.C. § 1349(c)(1), (c)(4). But the Secretary's alleged *failure* to approve a leasing program is not "[a]ny action of the Secretary to approve a leasing program," directly reviewable under that exclusive review provision. *Id*. § 1349(c)(1). Instead, as in *TRAC*, that provision, combined with the Court's authority under the All Writs Act, gives this Court jurisdiction over API's claim that Interior has failed to timely issue a Program. *TRAC*, 750 F.2d at 75. And because that claim affects

4

this Court's future jurisdiction to review a final Program's merits, the Court has jurisdiction to consider issuing a writ of mandamus under the All Writs Act. *See TRAC*, 750 F.2d at 75-79.

Other circuits follow this jurisdictional rule too, including the Fifth Circuit. *See JTB Tools & Oilfield Servs., LLC v. United States*, 831 F.3d 597, 599-601 & nn.3-4 (5th Cir. 2016) (joining circuits that follow *TRAC* or a similar rule). Despite that precedent, API first asserted its claim against Interior in the U.S. District Court for the Western District of Louisiana. That court followed Fifth Circuit precedent and dismissed the claim. *See API v. Interior*, No. 2:21-CV-02506, 2022 WL 16704444, at *4 (W.D. La. Oct. 5, 2022) (magistrate's report recommending Interior's motion to dismiss claim be granted); *API v. Interior*, No. 2:21-CV-02506, 2022 WL 16701179, at *1 (W.D. La. Nov. 3, 2022) (dismissing claim).

API now agrees that this Court has jurisdiction. API Br. 2-5. But it incorrectly asserts that this Court has jurisdiction under the Administrative Procedure Act (APA), 5 U.S.C. § 703. API Br. 2. The APA is "not a jurisdiction-conferring statute." *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009); *see also TRAC*, 750 F.2d at 78 (rejecting

district court review under APA Section 703). Here, OCSLA's judicial review provision, 43 U.S.C. § 1349(c)(1), (c)(4), confers jurisdiction on this Court to review the final Five-Year Program, while the Court's *authority* to compel Interior to act comes from a writ of mandamus under the All Writs Act. This distinction matters because the All Writs Act, not the APA, supplies the standard that API must satisfy to prevail on the merits (which as shown in Argument Point II, API has not met).

## STATEMENT OF THE ISSUES

This Court will grant the drastic remedy of a writ of mandamus against an agency only when a petitioner has established its standing and met three threshold requirements, including a "clear and indisputable right to relief," and when the Court finds "compelling equitable grounds." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). When a petitioner asserts that an agency has failed to timely act, this Court weighs the *TRAC* factors to determine whether the agency's delay is unreasonable. *Id*. This case presents three issues:

1.    Has API established standing, without substantiating harm to trade associations or any identified member thereof, and absent an administrative record to provide evidence of standing?

6

2.    Has API met the requirements for mandamus relief, including a clear and indisputable right to relief, when Interior's timeline in approving the next Five-Year Program is reasonable under the *TRAC* factors?

3.    Has API shown compelling equitable grounds for its requested mandamus relief, when Interior plans to approve the next Five-Year Program in December 2023, Congress has stepped in to address the current gap in Programs, the September 30, 2023, deadline that API requests is unworkable, and there is no allegation that even *un*identified API members will be harmed by a few months' additional delay?

## PERTINENT STATUTES

Pertinent statutes are in the Addendum.

## STATEMENT OF THE CASE

### A.    The Outer Continental Shelf Lands Act

The chief statute governing federal offshore oil and gas leasing is the Outer Continental Shelf Lands Act (OCSLA). Congress enacted OCSLA in 1953 and substantially amended the Act in 1978. As amended, OCSLA establishes a national policy of making the Outer

7

Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. § 1332(3); *see id*. § 1331(a) (defining the Shelf as "all submerged lands" beyond the lands reserved to the States up to the edge of the United States' jurisdiction and control).

The 1978 amendments established a graduated four-stage process by which Interior makes energy development decisions. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472-73 (D.C. Cir. 2009). This process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *Id*. (cleaned up).

In short, the four stages are: (1) Interior develops a national leasing program for a five-year period of potential lease sales in areas of the Shelf; (2) Interior may hold lease sales through a competitive sealed-bid auction; (3) Interior may approve plans allowing lessees to conduct exploration activities on the leased areas; and (4) if lessees discover valuable oil and gas deposits, Interior may approve plans

authorizing them to produce oil and gas from the leased areas. 43 U.S.C. §§ 1337, 1340, 1344, 1351.

This case is about OCSLA's first stage, in which the Secretary of the Interior "shall prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of" OCSLA. 43 U.S.C. § 1344(a). Congress directed that the Five-Year Program "shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity" that the Secretary "determines will best meet national energy needs for the five-year period following its approval or reapproval." *Id*.

Developing a Program is a complex task. *First*, Congress directed the Secretary to prepare and maintain a Program "in a manner consistent with" specific principles. 43 U.S.C. § 1344(a). *Second*, those principles require Interior to prepare extensive technical data and analyses to inform the Secretary's decisions about a Program. *Third*, Congress established procedures for federal agencies, States, and the public to provide input on a Program. *Id*. § 1344(c), (d)(1). In addition, at least 60 days before approving a Program, the Secretary must submit the Proposed Final Program to the President and Congress, with an

explanation why any recommendations from the Attorney General, States, and local governments were not accepted. *Id.* § 1344(d)(2).

To meet all these requirements, Interior's process for developing a Program consists of five major steps, three public comment periods, and three analytical phases. Declaration of Walter Cruickshank (Cruickshank Decl.) ¶ 5. The process is shown in the chart below. *Id.*

*Process for Developing a Five-Year Program*



### B.    Factual background

Beginning in 1980, Interior has approved nine Five-Year Programs. *See* Cruickshank Decl. ¶ 8. A Program usually covers a five-year period with no break between Programs, although Interior also may replace a Program before it expires. *Id*. In 2012, however, the 2007-2012 Program expired before Interior approved the 2012-2017 Program, resulting in a 57-day gap between those Programs. *Id*. ¶ 9. More recently, the 2017-2022 Program expired in July 2022 without a new Program in place.

### 1.    Interior starts developing a 2019-2024 Program

In January 2017, Interior approved the 2017-2022 Program. Cruickshank Decl. ¶ 9. Several months later, President Trump issued an executive order encouraging Interior to increase energy exploration and production on the Outer Continental Shelf. *Id*. ¶ 10. This led Interior to begin developing a new Program for 2019-2024 that would *replace* the existing 2017-2022 Program before it ended. *Id*.

In July 2017, Interior took the first of the five major steps, publishing a request for information. 82 Fed. Reg. 30886 (July 3, 2017). Then in January 2018, Interior published a Draft Proposed Program for

2019-2024.[2] Interior went on to develop the analyses and supporting documents for that Program. Cruickshank Decl. ¶ 10.

In March 2019, however, a district court vacated parts of President Trump's executive order, withdrawing areas of the Arctic from consideration for leasing in the 2019-2024 Proposed Program. *See League of Conservation Voters v. Trump*, 363 F. Supp. 3d 1013 (D. Alaska 2019), *vacated and remanded* 843 F. App'x 937 (9th Cir. 2021). Secretary Bernhardt then announced that Interior would postpone finalizing the 2019-2024 Proposed Program while the government appealed the adverse district court judgment. Cruickshank Decl. ¶ 11.

In January 2020, Interior resumed preparation of a Proposed Program. Cruickshank Decl. ¶ 11. Although Interior updated that Proposed Program and completed analyses to support it, Interior did not publish that document before the prior administration left office. *Id*.

## 2.     Interior starts developing a 2023-2028 Program

When the current administration took office in January 2021, President Biden promptly issued executive orders with significant

---

[2] 2019-2024 OCSLA Draft Proposed Program (Jan. 2018), *available at* https://perma.cc/LY7A-NTGV.

policy changes affecting the next Program. Cruickshank Decl. ¶¶ 12-13. Interior responded by preparing an updated Proposed Program and a draft Programmatic Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA). *Id.* ¶¶ 14-15.

In January 2022, Interior's leadership reviewed the Proposed Program and Draft Programmatic EIS and identified further analyses and policy issues to address. Cruickshank Decl. ¶ 15.

Weeks later, a district court issued an adverse decision that delayed Interior's work on the Proposed Program. *See Louisiana v. Bide*n, 585 F. Supp. 3d 840 (W.D. La. 2022); Cruickshank Decl. ¶ 16. The district court enjoined federal agencies from relying on the work product of an interagency working group. Cruickshank Decl. ¶ 16. Interior interpreted the injunction to prevent it from advancing its analysis of greenhouse gas emissions for the next Program because that analysis relied on information from the interagency working group. *Id.* After the Fifth Circuit stayed the injunction in March 2022, Interior completed its analysis. *See Louisiana v. Biden*, No. 22-30087, 2022 WL 866282 (5th Cir. Mar. 16, 2022) (per curiam) (granting stay pending

13

appeal), *stay application denied by* 142 S. Ct. 2750 (2022); Cruickshank Decl. ¶ 17.

In June 2022, Interior briefed the Secretary on the updated analytical results for the Proposed Program and Draft Programmatic EIS. Cruickshank Decl. ¶ 17. The Secretary made her decision on the Proposed Program on June 28, 2022. *Id.* Three days later, on July 1, 2022, Interior published the 2023-2028 Proposed Program and Draft Programmatic EIS. *Id.* The Proposed Program is more than 500 pages long and contains complex technical analyses and modeling.[3] The Draft Programmatic EIS is nearly 300 pages long with another 200 pages of appendices containing technical analyses and modeling.[4]

Publication of these documents began a 90-day comment period. Cruickshank Decl. ¶ 17. In August and September 2022, Interior held four open-house public meetings and one public comment meeting. *Id.* By the close of the public comment period on October 6, 2022, Interior

---

[3] 2023-2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program (July 2022), *available at* https://perma.cc/3MG9-QL4Z.

[4] 2023-2028 National Outer Continental Shelf Oil and Gas Leasing Program, Draft Programmatic EIS, Volume 1 (July 2022), *available at* https://perma.cc/3YCT-UGDR; Draft Programmatic EIS, Volume 2: Appendix (July 2022), *available at* https://perma.cc/784P-WHTM.

had received about 760,000 public comment letters, including detailed comments from API. *Id*. Since then, Interior has devoted substantial resources to analyzing the comments, addressing issues raised by the comments, and drafting responses to comments. *Id*.

### 3.    Timeline for completing the next Program

Interior needs until December 2023 to approve the next Five-Year Program. Cruickshank Decl. ¶¶ 19-23.

The fourth major step that Interior must take in developing the next Program is to issue the Proposed Final Program. Cruickshank Decl. ¶¶ 19-22. Before doing so, Interior must finish addressing the 760,000 public comments it received and complete its complex analytical work, including modeling greenhouse gas emissions and economic impacts of the alternative leasing scenarios. *Id*. ¶ 19. To complete its economic analysis, Interior needs data from the Energy Information Administration that is expected to become available in March 2023. Cruickshank Decl. ¶ 19. Once Interior has that data, it will complete its modeling. *Id*.

When Interior completes the required analyses, Interior's leadership will review that information, and the Secretary will decide

on a Proposed Final Program after weighing the factors Congress identified in OCSLA. Cruickshank Decl. ¶ 20-22. Interior expects to publish the Proposed Final Program and Final Programmatic EIS in September 2023. *Id*. ¶ 22.

After the Proposed Final Program issues, Interior will provide the required period of "[a]t least sixty days" for review by Congress and the President. 43 U.S.C. § 1344(d)(2). Then the Secretary may approve the final Program. Cruickshank Decl. ¶ 22. Due to the additional, necessary analyses to be done, Interior's review process, and the statutory review period of at least 60 days, Interior needs until December 2023 to approve the next Program. *Id*. ¶¶ 19-23. Interior expects the Secretary will approve the next Five-Year Program in December 2023. *Id*. ¶ 23.

### 4.    The Inflation Reduction Act

The 2017-2022 Program expired on June 30, 2022. At the time, Interior had not held three lease sales scheduled under that Program (Lease Sales 258, 259, and 261), and a fourth sale under that Program (Lease Sale 257) had been vacated by a district court. Cruickshank Decl. ¶ 18; *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022), *appeals pending* Nos. 22-5036, 22-5037 (D.C. Cir.).

Less than two months later, however, Congress passed, and the President signed, the Inflation Reduction Act. Pub. L. 117-169, 136 Stat. 1818 (Aug. 16, 2022). Two provisions are relevant here.

*First*, Congress directed Interior to accept the highest valid bids for Lease Sale 257 and issue leases to the highest bidders. *Id*. § 50264(b). And Congress directed Interior to hold Lease Sales 258, 259, and 261 by specified dates, "[n]otwithstanding the expiration of the 2017-2022 leasing program." *Id*. § 50264(c), (d), (e).

*Second*, Congress directed that for a ten-year period, Interior cannot issue a lease for offshore wind development unless, during the prior year, Interior has held an oil and gas lease sale and has offered for lease no fewer than 60 million acres. *Id*. § 50265.

Interior is complying with Congress' directions in the Inflation Reduction Act. Cruickshank Decl. ¶ 18. Thus, Interior accepted the bids for Lease Sale 257 and issued leases to the highest bidders. *Id*. Interior held Lease Sale 258 by the statutory deadline. *Id*. And Interior is preparing to hold Lease Sales 259 and 261 by their statutory deadlines of March 31, 2023, and September 30, 2023, respectively. *Id*.

17

## SUMMARY OF ARGUMENT

**Argument Point I.**  API has not met its standing burden. API elected not to submit any evidence of harm with its opening brief. And because this is a mandamus petition, there is no administrative record that can support API's standing. Nor is API's organizational or associational standing self-evident. Given the ongoing leasing required by the Inflation Reduction Act, there is no basis to assume that API's members are injured by Interior's delay in approving a new Five-Year Program.

**Argument Point II.**  Mandamus relief is reserved for extraordinary cases. This is not such a case.

A.  API does not expressly seek mandamus, but the nature of the relief that it requests—an order by this Court compelling Interior to act by a specific date—is properly asserted (and could only be asserted) as a writ of mandamus. Similarly, API does not cite or address the *TRAC* factors, but this Court routinely applies these factors when assessing a claim for unreasonable delay. API's failure to address the governing legal standards is an independent reason this Court should dismiss

18

API's claim. Nor can API rehabilitate that failure by raising new issues in its reply.

B. The *TRAC* factors tilt decidedly in Interior's favor. Interior's plan to approve the next Five-Year Program in December 2023 accords with the rule of reason—the first, and most important, *TRAC* factor. Development of a Program is an elaborate process. Interior must prepare complex technical and scientific analyses and consider hundreds of thousands of public comments. And the Secretary's decisions on a Program have significant, long-lasting policy impacts on the national economy, energy development, and the environment. Interior has completed three major steps and will need until December 2023 to complete the remaining two major steps. Interior needs that time to produce a reasoned, well-supported Program that can withstand court challenges. Compelling Interior to hastily approve a Program, as API urges, would be counterproductive and contrary to the interests of Interior, the public, and even API and its members.

The second *TRAC* factor, which looks to OCSLA's language, structure, and purpose, confirms that Interior's timing is reasonable. In Section 1344(a) of OCSLA, Congress did not set a deadline or timetable

for Program development. Nor did Congress categorically prohibit any gap between Programs. Instead, Congress directed the Secretary to consider several substantive principles and factors when preparing and maintaining a Program.

In seeking a court-ordered deadline for action, API overlooks the critical balancing that the Secretary must do to establish a new Program. Congress did not intend for the Secretary to elevate *time* over *substance* when developing a Program. And Congress' views on this specific dispute are illuminated by the Inflation Reduction Act, enacted after the 2017-2022 Program expired. Congress recognized that lapse but declined to set a deadline for Interior to approve the next Program, choosing instead to direct Interior to hold lease sales during the gap between Programs and to connect oil and gas leasing to offshore wind development leasing.

The remaining four *TRAC* factors also support Interior's position. API has not shown that the time gap between Programs is significantly prejudicing its members. And Interior is proceeding in good faith to prepare the next Program. API has not met the high bar to justify a mandamus remedy.

**Argument Point III.**  Even if API could meet the requirements for mandamus, no compelling equitable grounds justify that relief. Alternatively, the Court should retain jurisdiction until Interior approves the next Program.

Lastly, if the Court concludes that mandamus relief is warranted, it should not order Interior to approve the next Program before the end of 2023.

## STANDARD OF REVIEW

Mandamus is a "drastic" remedy, to be invoked "only in extraordinary circumstances." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) (cleaned up). To justify mandamus, the petitioner must show (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists. *Am. Hosp. Ass'n*, 812 F.3d at 189 (cleaned up). Mandamus claims that, like this one, "target agency delay, turn on whether the agency's delay is so egregious as to warrant mandamus." *Id.* (cleaned up). To make that determination, the Court is guided by the *TRAC* factors. *Id.* at 189 (cleaned up). Even when the requirements for mandamus are satisfied, however, the Court "may

grant relief only when it finds compelling equitable grounds." *Id.* (cleaned up).

## ARGUMENT

### I.   **API lacks standing.**

API does not assert that the Petitioner organizations have organizational standing but asserts that they satisfy the three requirements for associational standing. API Br. 9-14. An association has standing to sue on behalf of its members when: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). API has not met the first requirement.

API declined to submit declarations or comparable evidence, invoking the principle that standing in some cases is self-evident. API Br. 10 (quoting *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733-34 (D.C. Cir. 2003); *cf.* D.C. Cir. R. 28(a)(7) (when petitioner's standing "is not apparent from the administrative record, the brief must include

arguments and evidence establishing the claim of standing"). Some of Petitioner organizations' members have economic interests tied to oil and gas leasing, but API has failed to show that any individual member will suffer a concrete and imminent injury caused by the gap between the 2017-2022 Program and the next Five-Year Program. No such injury is apparent from the existing record because there is no record, only API's petition. *Cf. Fund for Animals*, 322 F.3d at 734 (finding any doubts about standing were dissipated by evidence in the district court record).

The evidence that API does cite is insufficient to show standing. API cites an undated study by a consultant it retained, API Br. 12 n.6, but that study relied on questionable assumptions that were no longer accurate when API filed its Petition for Review. The study assumed that development of a new Five-Year Program would not *begin* until "the beginning of the next administration" in January 2025, so no lease sales could occur before 2028. Study 5. Yet when API petitioned for review in August 2022, Interior had already completed three of the five major steps to develop the next Five-Year Program. *See above* p. 14.

23

API notes that its standing was uncontested when it participated as an intervenor-respondent in challenges to prior Five-Year Programs. API Br. 13. But jurisdictional issues are not settled by silence. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1325 (D.C. Cir. 2013). And those challenges to prior Programs included an administrative record that API could cite, and the Court could examine, to assure itself of API's standing. Not so here.

## II.    Mandamus relief against Interior is unwarranted.

### A.    API seeks mandamus relief, so the *TRAC* factors provide the applicable standard.

Although API has not expressly sought mandamus, either in its Petition for Review or Brief, that is the nature of the relief that it seeks. And it could be no other way because the Court's jurisdiction is limited to considering whether to issue a writ of mandamus in aid of its future jurisdiction to review a final Program under 43 U.S.C. § 1349(c)(1). Thus, in evaluating whether to grant that relief, this Court should apply the *TRAC* factors.

### 1.  API seeks equitable relief that it should have sought in a writ of mandamus.

In all but name, API seeks mandamus relief. API asks this Court to "*compel* Interior to approve a final Program promptly, and by no later than September 30, 2023." API Br. 19 (emphasis added). Thus, API asks the Court to grant equitable, injunctive relief against Interior, requiring it to take an action by a specific date. In the rare cases when this Court compels agencies to act, it typically does so by granting mandamus under its All Writs Act authority. *See, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855-62 (D.C. Cir. 2008) (granting a writ of mandamus and directing the agency to respond to the court's remand order "by November 5, 2008"); *In re Bluewater Network*, 234 F.3d 1305, 1310-11, 1315-16 (D.C. Cir. 2000) (granting mandamus when statute required agency to act within one year and the agency had delayed nine years).

API neither requests mandamus nor invokes the All Writs Act. But litigants do not dictate the contours of this Court's jurisdiction and authority, nor alter the applicable legal standards. The relief that API requests is in the nature of mandamus. *See In re Nat'l Nurses*, 47 F.4th at 755 n.5 (confirming that petitioners "were correct to request a writ of

25

mandamus" because they sought an order telling the agency "what . . .

not to do"). And the Court's authority to grant the relief that API seeks

derives from the All Writs Act. *See TRAC*, 750 F.2d at 76.

To that end, API should have petitioned for a writ of mandamus,

not filed a petition for review. *See* Fed. R. App. P. 21 (providing

procedures for petitioning for a writ of mandamus); Circuit Rule 21(a)

("No responsive pleading to a petition for an extraordinary writ to the

district court or an administrative agency, including a petition seeking

relief from unreasonable agency delay, is permitted unless requested by

the court."). A petition for review must specify the agency order or other

final action for the Court to review, Fed. R. App. P. 15(a)(2)(C), while

API here objects to Interior's purported *failure* to act. A failure to act is

not an "action of the Secretary to approve a leasing program" directly

reviewable under 43 U.S.C. § 1349(c)(1).

All the same, this Court may exercise discretion to construe API's

challenge as a petition for a writ of mandamus in aid of its future

jurisdiction under Section 1349(c)(1). *See, e.g.*, *In re: GTE Service Corp.*

762 F.2d 1024, 1026 (D.C. Cir. 1985) (construing a motion for stay as a

petition for writ of mandamus). This Court has taken similar

discretionary steps before. *See, e.g.*, *Ecolift Corp. v. FAA*, No. 20-1136, 2020 WL 2611032, at *1 (D.C. Cir. Apr. 30, 2020) (per curiam) (unpublished) ("Even if the court were to construe the petition for review as a petition for mandamus relief, petitioner has not demonstrated a clear and indisputable right to the relief sought.") (cleaned up); *cf. NetCoalition v. SEC*, 715 F.3d 342, 354 (D.C. Cir. 2013) (petitioners requested the court alternatively "construe their petitions for review as petitions for mandamus relief"); *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 551 (D.C. Cir. 1992) (treating appeal as a petition for mandamus).

API cannot avoid the high bar for obtaining mandamus relief by relying on APA Section 706(1). API Br. 14, 19. Section 706(1) authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). But that provision does not confer or expand this Court's jurisdiction. *See TRAC*, 750 F.2d at 76-77. Jurisdiction rests on OCSLA's judicial review provision, alongside the Court's All Writs Act authority. *See above* pp. 3-6. Thus, as this Court recently reiterated in a decision cited by API (Br. 16), "[w]hen an agency unlawfully withholds or unreasonably delays an action this court would

27

have jurisdiction to review, the All Writs Act empowers us to issue a writ compelling the agency to complete the action so we can exercise our jurisdiction to review it." *In re Nat'l Nurses*, 47 F.4th at 752.

Furthermore, Section 706(1) "carried forward the traditional practice" of judicial review through "use of the so-called prerogative writs—principally writs of mandamus under the All Writs Act, now codified at 28 U.S.C. § 1651(a)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) (*SUWA*) (discussing 5 U.S.C. § 706(1)). Thus, where (as here) the jurisdiction-granting statute itself does not encompass claims challenging agency inaction, a claim under Section 706(1) to compel an agency official to act still must be asserted as a writ of mandamus. *See, e.g.*, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 19 n.10 (2013) (noting petitioner "would be free to seek a writ of mandamus to 'compel agency action unlawfully withheld or unreasonably delayed'") (quoting 5 U.S.C. § 706(1)); *In re Bluewater Network*, 234 F.3d at 1315-16 (granting mandamus because agency had "unreasonably delayed" when agency failed to meet one-year statutory deadline).

Even when Section 706(1) of the APA could operate independently of a writ of mandamus, similar equitable considerations apply to both. An order compelling agency action under the APA rests on the Court's equitable discretion. *See, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1096 (D.C. Cir. 2001) ("[A] finding that delay is unreasonable does not, alone, justify judicial intervention." (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)). The APA codified traditional mandamus practice, and it contains no language unequivocally divesting courts of their equitable discretion under that practice. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (courts apply the full scope of their equitable jurisdiction unless expressly restricted by statute); *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979) (courts retain equitable powers "[a]bsent the clearest command to the contrary from Congress").

Whether styled as a petition for review or a petition for a writ of mandamus, API seeks mandamus relief. Section 706(1) of the APA does not confer jurisdiction, and a cause of action under Section 706(1) cannot be asserted directly under OCSLA's judicial review provision because that provision does not grant this Court jurisdiction to review challenges to agency inaction. To the extent Section 706(1) is relevant

at all, it is limited to providing context and guidance for this Court's application of its mandamus jurisdiction. But even if API did not need to seek mandamus, the same equitable considerations apply to API's request for the Court to compel Interior to act. Those considerations weigh in favor of denying API's request for relief, however packaged. *See below* Argument Point I.B.

## 2.    The *TRAC* factors apply to API's claim.

To obtain mandamus relief, API must meet the three threshold legal requirements, as well as show compelling equitable grounds for that relief. *Am. Hosp. Ass'n*, 812 F.3d at 189. In cases like this one, this Court weighs the *TRAC* factors when considering whether to grant mandamus relief. *Id*. This is because "[e]quitable relief, particularly mandamus, does not necessarily follow a finding of a violation" of a statutory mandate, including deadlines set by Congress. *In re Barr Labs.*, 930 F.2d at 74-75 (applying *TRAC* factors after concluding that agency violated statutory deadline); *see also Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 541-46 (1987) (affirming that traditional equitable principles applied in reversing court of appeal's injunction against exploration activities authorized under OCSLA leases). This

Court has "considered numerous cases in which an agency failed to meet a statutory deadline," and it applies the *TRAC* factors to decide whether a petitioner is "entitled to relief from the agency's delay." *W. Coal Traffic League v. STB*, 216 F.3d 1168, 1174 (D.C. Cir. 2000).

Even if this case did not require API to seek a writ of mandamus, the *TRAC* factors would still apply. *See, e.g.*, *id*. at 1174 & footnote (considering *TRAC* factors even though "unlike most unreasonable delay cases under *TRAC*, this is not a mandamus proceeding"). This Court has noted that an action under Section 706(1) of the APA is "similar to a petition for mandamus," so the Court will apply the "six-factor standard" in *TRAC* to "determine if 'the agency has a duty to act and [if] it has 'unreasonably delayed' in discharging that duty." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1280 (D.C. Cir. 2005) (cleaned up).

Despite *TRAC* being the "leading case" for decades on unreasonable delay claims, *In re Barr Labs.*, 930 F.2d at 74, API has failed to expressly address the *TRAC* factors. That failure means that API has not met its burden to show a "clear and indisputable right to relief." *Am. Hosp. Ass'n*, 812 F.3d at 189. This is reason enough for the

31

Court to dismiss API's petition. Nor can API rehabilitate that failure by raising new *TRAC* arguments in reply. *See, e.g.*, *Jarkesy v. SEC*, 803 F.3d 9, 30 (D.C. Cir. 2015) (appellant forfeited *TRAC* jurisdictional argument by failing to raise it in opening brief); *In re Barr Labs.*, 930 F.2d at 75-76 (declining to address a claim about a *TRAC* factor because the petitioner "raised the issue only in its reply," and "respect for the adversary process makes it inappropriate to address the claim at all").

### B.  The *TRAC* factors weigh heavily against mandamus relief.

In *TRAC*, this Court emphasized that the liability analysis for an unreasonable delay claim focuses on "whether the agency's delay is so egregious as to warrant mandamus." 750 F.2d at 79. The Court adopted six factors to guide this inquiry. Those factors are:

(1)   the time agencies take to make decisions must be governed by a "rule of reason";

(2)   where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

(3)   delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

(4)     the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)     the court should also take into account the nature and extent of the interests prejudiced by delay; and

(6)     the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d at 80 (cleaned up). Application of these factors here confirms that Interior has *not* unreasonably delayed approval of the next Five-Year Program. Thus, the Court should deny mandamus relief.

### 1.    Interior's plan to approve the next Five-Year Program in December 2023 is within the rule of reason.

The first and most important *TRAC* factor is that a "rule of reason" governs the time agencies take to make decisions. 750 F.2d at 80; *Core Commc'ns, Inc.*, 531 F.3d at 855. The rule of reason "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). Rather, the reasonable time frame for agency action rests in large part on (1) the "complexity of the task at hand," (2) the "significance (and permanence) of the outcome," and (3) the "resources

available to the agency." *Id*. The time that Interior needs to complete the next Program—until December 2023—satisfies the rule of reason.

*First*, a Program is in the upper range of complexity for agency decisionmaking. *See Mashpee*, 336 F.3d at 1102. Developing a new Program is a years-long process with five major steps, each of which rests on technical and scientific analyses. Cruickshank Decl. ¶ 5. This is illustrated by the hundreds of pages of analysis that Interior prepared at the third major step in July 2022, when it issued the Proposed Program and Draft Programmatic EIS. *See* p. 14 & nn.3, 4. At each step, Interior relies on rigorous analyses to inform its decisionmaking.

*Second*, a Program has far-reaching effects on national energy and environmental policies that stretch well beyond the period that a Program is in place. *See Mashpee*, 336 F.3d at 1102. A Program sets a five-year schedule of proposed lease sales for areas of the Outer Continental Shelf. But scheduling a lease sale is just the beginning of the lengthy process of exploration, development, and production on the Shelf that can last up to half a century. Cruickshank Decl. ¶ 4. As this Court observed, a Program "carries enormous practical and legal significance" because the "key national decisions as to the size, timing,

34

and location of OCS leasing—as well as the basic economic analyses and justifications for such decisions—are made at this first stage." *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (cleaned up). The Secretary's decision on the next Program will have lasting, significant policy implications for the country on economic, energy development, and environmental issues for decades to come.

*Third*, Interior has dedicated staff who work full time on the technical and scientific analyses required for a Program. *See Mashpee*, 336 F.3d at 1102; Cruickshank Decl. ¶ 5. But developing those analyses is a time-consuming, challenging process. Cruickshank Decl. ¶¶ 5-7, 19. And Interior needs data from the Energy Information Administration before it can proceed to update and finalize the economic modeling. *Id*. ¶ 19.

API insists that Interior must act faster, approving a Program by September 30, 2023. API Br. 19-21. But its reasons for proposing this date are factually and legally flawed. API focuses on the period from July 2017 to the present. *Id*. API highlights Interior's "unprecedented delay *to date*, including 4.5 years between the Draft Proposed Program and Proposed Program, encompassing the first 18 months of the current

Administration." *Id*. at 20 (emphasis added). In API's view, that period has "afforded more than sufficient opportunity for stakeholder input and for Interior to approve a final Program." *Id*. at 20-21. In other words, API's position is that Interior should "promptly finalize a Program" because it *already* had more than enough time to complete a Program. *Id*. at 19.

API's position is incorrect. The time that Interior took from July 2017 to the present to complete three major steps in developing the next Program is reasonable. Contrary to the simplistic narrative that API advances, the last 4 years involved many twists and turns. That period straddled two presidential administrations with starkly contrasting policy directions. Cruickshank Decl. ¶¶ 10-15. As "an agency under the direction of the executive branch," Interior "must implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784-85 (D.C. Cir. 2012). The Executive Branch has a right to change positions, and implementing those changes consistent with the APA often takes substantial time. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-16 (2009) (an agency may

change position but must display awareness it is doing so and provide "good reasons for the new policy").

That is the case here. During the last administration, Interior's leadership decided to develop a new Program before the 2017-2022 Program expired, but Interior only completed the first and second major steps. Cruickshank Decl. ¶¶ 10-11. When President Biden took office in January 2021, he gave Interior new policy guidance that required it to adjust its approach. *Id.* ¶¶ 12-15.

Meanwhile, at critical junctures, Interior's efforts to develop a new Program were hindered by adverse decisions from federal district courts. Cruickshank Decl. ¶¶ 11, 16-17. Even while those decisions were appealed, Interior still had to comply with them, delaying its progress on a new Program. *Id.*

Despite changes in policy direction and legal setbacks, Interior has made substantial progress developing a new Program, completing three of the five major steps by July 2022. Cruickshank Decl. ¶¶ 10-17. In sum, none of API's objections show that Interior acted unreasonably during the period from July 2017 to the present.

Besides, Interior's conduct until the present is not the most important question before the Court. Perhaps in an alternative scenario, Interior *could* have approved a final Program by July 2022, when the 2017-2022 Program expired. But neither Interior nor the Court can rewind time. And the point of mandamus is not to "punish" Interior for its alleged "past delay by imposing a mandatory, accelerated timetable." *United Steelworkers v. Rubber Mfrs. Ass'n*, 783 F.2d 1117, 1120 (D.C. Cir. 1986). The point is to identify the reasonable time required for Interior to complete its work—measured from the present.

At present, Interior still has two major steps left to finalize a Program. Cruickshank Decl. ¶¶ 19-23. The reasonableness of the time that has passed is of little relevance to how long the remaining steps will take. *United Steelworkers*, 783 F.2d at 1120 (suggesting that reasonableness of time that had elapsed was not before the Court). And even if it were a consideration, "judicial imposition of an overly hasty timetable at this stage would ill serve the public interest." *Id*.

To that end, a Program "must be constructed carefully and thoroughly if the agency's action is to pass judicial scrutiny." *Id*. Five-Year Programs are routinely challenged in this Court. Five of the nine

Programs have been challenged, including two of the last three. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588 (D.C. Cir. 2015) (2012-2017 Program); *Ctr. For Biological Diversity v. Interior*, 563 F.3d 466 (D.C. Cir. 2009) (2007-2012 Program); *NRDC v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988); *California v. Watt*, 712 F.2d 584 (D.C. Cir. 1983) (1982-1987 Program); *California v. Watt*, 668 F.2d 1290 (D.C. Cir. 1981) (1980-1985 Program). That record underscores why Interior needs adequate time to complete the intricate technical and scientific analyses to support a Program.

By contrast, the truncated time frame urged by API would deny Interior the time needed to conduct these analyses and reach considered results that appropriately balance the four principles and eight factors that Congress told the Secretary to consider. 43 U.S.C. § 1344(a). Rushed and less considered decisions are more likely to result in future challenges to the next Program and increase the risk of time-consuming remands to Interior that delay implementation of the very Program that API desires. *See Sierra Club v. Thomas*, 828 F.2d 783, 798-99 (D.C. Cir. 1987); *see also In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 555 (D.C. Cir. 1999) ("[T]he agency's plan may well shorten

the overall period of delay by resolving issues that would otherwise become the subject of litigation.").

API offers little to justify its September 30, 2023 deadline. It opines (Br. 19) that there is "no legitimate reason Interior cannot promptly finalize a Program," but in fact, Interior has identified concrete and compelling reasons why it needs more time to complete a Program—until December 2023. Cruickshank Decl. ¶¶ 19-23.

The two major steps that remain are the Proposed Final Program and the final Five-Year Program. *See* Cruickshank Decl. ¶ 5. To complete these steps, Interior must: (1) finish considering and responding to 760,000 comments on the Draft Proposed Final Program and Draft Programmatic EIS; (2) update the technical modeling of economic impacts and greenhouse gas emissions; (3) finalize documents supporting a Program, including a final Programmatic EIS; (4) decide on the Proposed Final Program; (5) allow Congress and the President at least 60 days to review the Proposed Final Program; and (6) decide on a Final Five-Year Program. *Id*. ¶¶ 19-23.

These activities build on and interrelate to each other. For example, the Secretary cannot publish a Proposed Final Program until

Interior completes the economic modeling. Cruickshank Decl. ¶¶ 19-21.

And Interior cannot complete that modeling until the Energy

Information Administration releases critical inputs for that modeling,

which should occur in March 2023. *Id*. ¶ 19.

API correctly notes (Br. 20) that Interior "has issued nothing"

since the public comment period on the Proposed Program ended on

October 6, 2022. But Interior has been actively developing a Program.

The agency has been diligently evaluating the 760,000 comments it

received, including API's detailed comments. Cruickshank Decl. ¶ 17.

Interior also must complete additional analyses and modeling before

issuing the Proposed Final Program. *Id*. ¶ 19. API contends that

Interior already has "[r]obust studies" to support a final Program. API

Br. 20-21. But Interior still needs to complete complex analytical work,

including modeling greenhouse gas emissions and the economic impacts

of alternative leasing scenarios. Cruickshank Decl. ¶ 19. Finally,

Interior must provide at least 60 days for review by Congress and the

President. 43 U.S.C. § 1344(d)(2).

Long ago, this Court recognized that an agency is "entitled to

considerable deference in establishing a timetable for completing its

proceedings," *Cutler v. Hayes*, 818 F.2d 879, 896 (D.C. Cir. 1987),
particularly when the proceedings present "complex scientific and
technical issues," *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*,
768 F.2d 1480, 1488 (D.C. Cir. 1985). Interior has set a schedule to
approve the next Program in December 2023, and it has explained why
it needs that time to adequately prepare a Program. Cruickshank Decl.
¶¶ 19-23. None of API's objections undermine Interior's explanation.
Given the complexity and range of issues that Interior must address,
Interior's approach and schedule accords with the rule of reason.

## 2. The statutory scheme confirms that Interior is acting within the rule of reason.

The second *TRAC* factor asks whether Congress set a statutory
timetable or other indication of the speed with which it expects the
agency to proceed that supplies content for the rule of reason. 750 F.2d
at 80. OCSLA's text and structure confirm that Interior's plan satisfies
the rule of reason.

Congress imposed no firm deadline for Interior to act and did not
categorically preclude any gap between Five-Year Programs. Section
1344(a) of OCSLA provides that Interior "shall prepare and periodically
revise, and maintain an oil and gas leasing program to implement the

policies of this subchapter." 43 U.S.C. § 1344(a). And the provision then defines "leasing program" to be the "schedule of proposed lease sales" that the Secretary "determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. § 1344(a). But the statute imposes no timetable on which Interior must take the five major steps to approve a Program. *See* 43 U.S.C. § 1344. Nor does it impose a specific statutory deadline for Interior to approve a Program. *Id*. The only obligation is for Interior to prepare, periodically revise, and maintain a Program.

API's reliance on the word "maintain" does not carry the day under the *TRAC* factors. The ordinary meaning of "maintain" when Congress enacted Section 1344(a) in 1976 includes "to keep in an existing state (as of repair, efficiency, or validity)" and to "preserve from failure or decline." Webster's *New Collegiate Dictionary* 693 (1976). That ordinary understanding of "maintain" does not mean Congress prohibited any gap at all *between* Programs, where each successive Program is a new entity requiring separate "approval or reapproval." 43 U.S.C. § 1344(a). Indeed, a Program sets a "schedule of proposed lease sales," *id.*, which necessarily means there have been gaps of varying

lengths between lease sales, regardless of whether successive Programs are in place without interruption. The question here is whether the gap between Programs is reasonable, when Interior is actively taking the necessary steps to *prepare* the next Program and when Congress has ordered certain lease sales to be held in the interim notwithstanding expiration of the previous Program, *see above* pp. 12-17.

On that score, API overlooks the key language that follows and provides content to the requirement to prepare and maintain a Program. Congress directed that a Program "*shall* be prepared *and maintained* in a manner *consistent with the following principles.*" 43 U.S.C. § 1344(a) (emphasis added). If the "shall" in the first two sentences of Section 1344(a) are mandatory, as API urges (Br. 16),[5] then so too is the "shall" in the third sentence. In other words, Congress required the Secretary to apply four principles when preparing and maintaining a Program.

---

[5] Relying on Section 1344(a)'s use of the word "shall," API contends that the provision "creates a nondiscretionary and continuing duty for Interior to prepare and maintain a Program *in place*." API Br. 19 (emphasis added). Yet the final words that API adds in its brief—"in place"—appear nowhere in Section 1344(a).

The principles are broad and multifaceted. *First*, Interior must manage the Outer Continental Shelf "in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources" of the Shelf, and the "potential impact of oil and gas exploration on other resource values" of the Shelf and the "marine, coastal, and human environments." 43 U.S.C. § 1344(a)(1). *Second*, in selecting the timing and location for leasing, Congress directed Interior to consider eight diverse factors, from the needs of energy markets to the relative environmental sensitivity and marine productivity of different areas of the Shelf. *Id.* § 1344(a)(2). *Third*, the Secretary "shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone." *Id.* § 1344(a)(3). *Fourth* and finally, Interior must assure it receives fair market value for the leases it sells. *Id.* § 1344(a)(4).

Developing a Program that properly weighs these four principles is an intricate, time-consuming task. Interior is diligently proceeding to do so. But API's position would force Interior to sacrifice full

consideration of those principles to rush to approve a Program. That would disregard Congress' plain instructions in Section 1344(a). "Neither the statute nor the legislative history give any indication that Congress considered compliance" with the basic requirement to prepare and maintain a Program "more important than the substantive purposes for which" Interior issues a Program. *W. Coal Traffic League*, 216 F.3d at 1175. Yet API's interpretation of the statute would elevate *timing* over the *substance* of Section 1344(a). To the contrary, the detail with which Congress laid out principles that the Secretary must consider confirms that the *substance* of a Program is more important than merely having one.

Attempting to bolster its reading of Section 1344(a), API quotes several of this Court's statements about Five-Year Programs. API Br. 15-16. The Court has recognized Interior has a "continuing duty to promulgate five-year Leasing Programs under OCSLA." *Ctr. for Biological Diversity*, 563 F.3d at 485. Similarly, OCSLA "charges the Secretary of the Interior with preparing a program every five years containing a schedule of proposed leases." *Ctr. for Sustainable Econ.*, 779 F.3d at 592. These statements—made during the Court's review of

46

final Five-Year Programs, not in a mandamus petition to compel

Interior to act—do not point to a deadline or timetable that applies to a

Program.

The lack of a timetable or deadline in Section 1344(a) contrasts

with other provisions in Section 1344 that *do* have time limits. Section

1344(e) provides that the Secretary "shall review the leasing program

approved under this section *at least once each year*." 43 U.S.C. § 1344(e)

(emphasis added). The balance of Section 1344(e) vests the Secretary

with discretion—she "*may* revise and reapprove such program, *at any*

*time*, and such revision and reapproval, except in the case of a revision

which is not significant, shall be in the same manner as originally

developed." 43 U.S.C. § 1344(e) (emphasis added).

Congress also imposed *minimum* time periods that Interior must

allow for review by States and the President and Congress. *See* 43

U.S.C. § 1344(c)(2) (proposed leasing program must be submitted to

State governors "at least sixty days prior to publication"); *id.* §

1344(d)(2) (at least sixty days before approving a proposed leasing

program, the Secretary must submit it to the President and Congress).

These detailed instructions notably contrast with how, again, nothing in

Section 1344 provides a clear timetable or deadline for Interior to develop and approve a Program or categorically prohibits a gap between Programs. *Cf. In re Barr Labs.*, 930 F.2d at 75 (statutory 180-day deadline supplied content for the rule of reason).[6]

While API overlooks the substance of Section 1344(a), it leans on other provisions establishing OCSLA's overarching goals. API Br. 18. Congress did not, however, use compulsory language when it declared that OCSLA's policies and procedures were "intended to result in expedited exploration and development of the Outer Continental Shelf." 43 U.S.C. § 1802(1). A general legislative *purpose* cannot override the plain statutory *text* that directs Interior to consider substantive principles when preparing and maintaining a Program. *Id.* § 1344(a). And API omits other statutory goals that reinforce those principles. *See, e.g.*, *id.* § 1802(2) (oil and gas leasing on the Shelf should be done "consistent with the need" . . . "(B) to balance orderly energy resource

---

[6] API asserts that it is unprecedented to have a gap between Programs. API Br. 6. But the 2007-2012 Program expired before Interior approved the 2012-2017 Program, resulting in gap of about two months. Cruickshank Decl. ¶ 9.

development with protection of the human, marine, and coastal environments").

Finally, the Inflation Reduction Act supports Interior's position as applied to this case. The 2017-2022 Program expired on June 30, 2022, and days later, Interior issued the 2023-2028 Proposed Program. Cruickshank Decl. ¶ 17. When Congress passed the Inflation Reduction Act in August 2022, it knew that Interior had canceled several lease sales under the 2017-2022 Program, that there already was a break between Programs, and that Interior had two major steps left to complete before a new Program could issue.

Congress' response is illuminating. *See Am. Hosp. Ass'n*, 812 F.3d at 192 ("Congress's awareness of and attention to the situation counsel against issuance of the writ."). In the Inflation Reduction Act, Congress directed Interior to complete Lease Sale 257 and hold the last three lease sales under the 2017-2022 Program by set dates. Pub. L. 117-169, § 50264. But it declined to order Interior to issue a Program or to establish a deadline for doing so. Instead, Congress provided that for a ten-year period, Interior cannot issue leases for offshore wind development unless Interior holds an offshore oil and gas lease sale

during the prior year and the total acres offered during that period is at least 60 million acres. *Id.*, § 50265.

Put differently, Congress knew that Interior would likely not issue a new Program for some time. But rather than set a deadline for Interior to approve a Program, Congress directed Interior to hold three lease sales contemplated by the expired Program by specific dates in 2022 and 2023 and linked issuance and implementation of a new Program to one of Interior's stated priorities—increasing offshore wind development. Congress' approach confirms that Interior's plan to finalize the next Program in December 2023 is reasonable.

### 3. Human health and welfare favor Interior's approach.

The third *TRAC* factor recognizes that delays that might be reasonable in economic regulation are less tolerable when human health and welfare are at stake. 750 F.2d at 80. The interests that API and its members advance are purely commercial, and do not implicate "human health and welfare," so the "need to protect [them] through the exceptional remedy of mandamus is therefore lessened." *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 945 (D.C. Cir. 1988); *cf. In re United*

*Mine Workers*, 190 F.3d at 552 (human health at risk when agency delayed a rule to control diesel exhaust emissions in coal mines).

In fact, the third *TRAC* factor supports Interior when one considers the principles that Congress set out for development of a Program. Congress emphasized that the Secretary should not promote oil and gas leasing at all costs, but must consider "social[] and environmental values" and the effect of leasing on the human environment. 43 U.S.C. § 1344(a)(1). And Interior must ensure a "proper balance between" environmental and economic considerations. 43 U.S.C. § 1344(a)(3); *see also id.* §§ 1344(a)(1), 1344(a)(2)(G), 1344(a)(2)(H). Balancing these interests calls for careful analysis and deliberation.

### 4.  Interior has reasonably prioritized its activities and will continue to do so.

The fourth *TRAC* factor instructs the Court to consider the effect of expediting agency action on agency activities of a higher or competing priority. 750 F.2d at 80. Interior has staff dedicated to developing a Program, but Interior also has responsibility for other related tasks—such as the leasing actions required by the Inflation Reduction Act—and Interior cannot drop those other obligations and commit more

51

resources to developing a Program. Looking ahead, Interior will continue to devote staff to the technical and scientific analyses required for a Program.

### 5. Expediting issuance of a Program would harm Interior and the public.

The fifth *TRAC* factor considers the nature and extent of the interests prejudiced by delay. This factor also supports Interior's plan to approve the next Program in December 2023.

API identifies no prejudice in the Argument section of its brief. API Br. 14-21. When addressing standing, API claims, without any record support, *see above* Argument Point I, that its members "face concrete and cognizable harm because of Interior's failure to timely prepare and maintain a Program." *Id.* at 11. Any prejudice along those lines, however, is diminished by Congress' enactment of the Inflation Reduction Act, which directed Interior to continue holding lease sales after the 2017-2022 Program expired in June 2022.

Under that Act, Interior has issued leases to the highest bidders in Lease Sale 257. Pub. L. 117-169, § 50264(b). And Interior also has held Lease Sale 258, and it plans to hold Lease Sales 259 and 261 by the dates required by Congress. *Id.* §§ 50264(c), (d), (e); Cruickshank

Decl. ¶ 18. API's members have had, or will have, the opportunity to bid on and acquire leases in each of those sales. The last of those sales must be held by September 30, 2023, just three months before Interior plans to approve the next Program in December 2023. Yet in alleging harm to its members from the gap after the 2017-2022 Program, API fails to account for the lease sales required by the Inflation Reduction Act. API Br. 10-12.

On the other side of the ledger, expediting issuance of a Program as requested by API would force Interior to act without due deliberation. API's truncated deadline would leave insufficient time for Interior to fully complete its ongoing technical analyses, and the remaining regulatory steps. This, in turn, could impair the quality and defensibility of the ultimate decisions made by the Secretary, and result in further administrative proceedings down the road to correct any issues. *See Sierra Club*, 828 F.2d at 798 ("EPA must be afforded the time necessary . . . so that it can reach considered results in a final rulemaking that will not be arbitrary and capricious or an abuse of discretion."). That outcome would undermine the interests of Interior and the public and would not benefit API or its members. *See, e.g.*,

*United Steel Workers of Am.*, 783 F.2d at 1120 (denying writ seeking accelerated rulemaking, explaining that "judicial imposition of an overly hasty timetable . . . would ill serve the public interest").

### 6.    Interior has acted in good faith in developing a Program.

The sixth and final *TRAC* factor provides that the Court "need not find any impropriety lurking behind agency lassitude to hold that agency action is 'unreasonably delayed.'" 750 F.2d at 80. But if an agency has "manifested bad faith, as by singling someone out for bad treatment or asserting utter indifference to a congressional deadline, the agency will have a hard time claiming legitimacy for its priorities." *In re Barr Labs.*, 930 F.2d at 76.

API has not suggested that any impropriety has occurred, so it is too late for API to do so. *See In re Barr Labs.*, 930 F.2d at 75-76 (declining to consider petitioner's claim of bad faith because it was raised only in its reply). Nor has API offered clear evidence to rebut the well-established presumption that Executive Branch officials "will discharge their duties in good faith." *CTIA-The Wireless Assn v. FCC*, 530 F.3d 984, 989 (D.C. Cir. 2008) (cleaned up); *Latif v. Obama*, 677

F.3d 1175, 1178 (D.C. Cir. 2012) (presumption of regularity applies to official acts of public officers absent clear evidence to the contrary).

Besides, Interior has shown good faith by diligently seeking to comply with Section 1344 of OCSLA while implementing the direction of successive Presidents, respecting decisions by two federal district courts, and adhering to Congress' directions in the Inflation Reduction Act. Cruickshank Decl. ¶¶ 10-18. The "absence of bad faith" is "relevant to the appropriateness of mandamus," *In re Barr Labs.*, 930 F.2d at 76, and counsels against a finding of unreasonable delay.

*    *    *

In sum, the *TRAC* factors confirm that Interior's plan to approve the next Five-Year Program in December 2023 is reasonable. API has not addressed the *TRAC* factors and has waived the opportunity to do so. In any event, API has failed to show that Interior's "delay is so egregious as to warrant mandamus.'" *Id*. (cleaned up). Put differently, API failed to meet its burden to show that it has a "clear and indisputable right" to a writ of mandamus against Interior. *Am. Hosp. Ass'n*, 812 F.3d at 189 (cleaned up).

### III.    API lacks compelling equitable grounds for the mandamus relief it seeks.

Even if API had met the other requirements for mandamus relief, the Court "may grant relief *only* when it finds *compelling equitable grounds*." *Am. Hosp. Ass'n*, 812 F.3d at 189 (emphasis added); *see also In re United Mine Workers*, 190 F.3d at 551 (equitable relief, "particularly mandamus, does not necessarily follow a finding of a statutory violation") (cleaned up). Here, equity supports Interior's position and cuts against the specific relief that API requests—imposing a September 30, 2023 deadline on Interior.

The Court should dismiss or deny API's petition without prejudice on equitable grounds. "Equitable relief, particularly mandamus, does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *In re Barr Labs.*, 930 F.2d at 74.

As an equitable matter, this Court need not intervene when Interior is acting on a reasonable timeline. When API petitioned for review, Interior had completed three of the five major steps to approve the next Program, and just two months had passed since the 2017-2022

Program had expired. Cruickshank Decl. ¶ 17. And Interior is diligently taking the critical steps to approve the next Five-Year Program in December 2023. *Id*. ¶¶ 19-23. Because Interior is "now proceeding toward completion" of a Program "within a reasonable time," there is "no need, at this juncture, for a court order compelling agency action unreasonably delayed." *Oil, Chem. & Atomic Workers Int'l Union*, 768 F.2d at 1488.

Congress' targeted measures in the Inflation Reduction Act also counsel against this Court's intervention. In that Act, Congress (1) filled the gap between the 2017-2022 Program and the next Program, and (2) connected future wind development leasing to future oil and gas leasing. Pub. L. 117-169, §§ 50264, 50265. This Court should not second-guess Congress' judgment nor Interior's good-faith, ongoing efforts. *See Am. Hosp. Ass'n*, 812 F.3d at 192 (Congress' "awareness and attention to a situation" and provision of a remedy that "may offer less than full relief" are reasons that counsel against mandamus relief.).

This is especially true when API has identified *no* compelling reasons why this Court should impose a writ of mandamus on Interior—an "extraordinary and intrusive" remedy that "risks

infringing on the authority and discretion of the executive branch." *Id.* at 192. The circumstances here contrast starkly with situations when this Court has found it necessary to impose mandamus on an agency for unreasonable delay. *Cf. In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (finding that all *TRAC* factors favored mandamus because agency had delayed compliance with a clear one-year timeline by nine years and "admitted its continuing recalcitrance").

Equitable relief "must be carefully designed to remedy the violation to which it is directed as efficiently as possible." *In re Am. Fed. of Gov't Employees, AFL-CIO*, 837 F.2d 503, 507 (D.C. Cir. 1988). API's requested September 30, 2023 deadline is "too blunt an instrument to remedy the threat of unreasonable delay." *Id.* And if the Court concludes that the relief sought by API is unwarranted, then it "need not decide whether" Interior "in fact delayed unreasonably." *Id.* If there is no remedy, then "there's no need to decide if there was a wrong." *Id.* Dismissal or denial without prejudice would allow API to renew its petition, should Interior take longer than anticipated to approve a Program—using the proper vehicle of a petition for a writ of mandamus.

Alternatively, the Court should retain jurisdiction until Interior approves a Program. *See, e.g.*, *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1354 (D.C. Cir. 1986) (declining to issue mandamus because of the agency's progress but retaining jurisdiction). If the Court retains jurisdiction, it also may order Interior to provide reports on its progress to ensure that it remains on schedule to approve the next Program. *See, e.g.*, *TRAC*, 750 F.2d at 80 (declining to decide whether mandamus was justified but retaining jurisdiction and directing the agency to provide status updates).

Finally, if the Court were to conclude that mandamus relief was warranted, it should adopt Interior's reasonable deadline of December 2023. Even if the Court finds (1) that Interior has violated a clear statutory duty in Section 1344(a) of OCSLA, (2) that under the *TRAC* factors, Interior has egregiously delayed approval of a Program as to justify the extraordinary remedy of mandamus, and (3) that compelling equitable grounds support mandamus—even then, API's proposed deadline is arbitrary and unreasonable.

API asks the Court to compel Interior to approve a Program by September 30, 2023. API Br. 19-21. API appears to have selected that

date in its brief in large part because it is the deadline that Congress set in the Inflation Reduction Act for Interior to hold the last lease sale originally scheduled for the 2017-2022 Program. *See* API Br. 20. Yet Congress declined to select that date—or any other date—for Interior to approve the next Program, despite Congress' recognition that the 2017-2022 Program had lapsed months earlier. Pub. L. 117-169, § 50264.

Besides, API's date disregards the complex scientific and technical analyses that Interior must complete to properly support the Secretary's decision to approve a new Five-Year Program. *See above* Argument Point II.B. Interior plans to approve the next Program in December 2023—just three months later than the date API requests. If the Court concludes that mandamus must issue, it should order the Secretary to approve a Program by Interior's planned date.

# CONCLUSION

For all these reasons, API's petition for review should be

dismissed or denied.

Respectfully submitted,

/s/ Justin D. Heminger

TODD KIM

*Assistant Attorney General*

KEVIN W. McARDLE

Of Counsel:                                JUSTIN D. HEMINGER

*Attorneys*

MELISSA A. HEARNE                  Environment and Natural Resources

CORY S. SPILLER                       Division

*Attorneys*                                   U.S. Department of Justice

Division of Mineral Resources       Post Office Box 7415

Office of the Solicitor                   Washington, D.C. 20044

U.S. Department of the Interior      (202) 514-5442

justin.heminger@usdoj.gov

March 6, 2023

DJ 90-13-8-16882

61

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of

Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the

parts of the document exempted by Federal Rule of Appellate Procedure

32(f), this document contains 11,509 words.

2.    This document complies with the typeface requirements of

Federal Rule of Appellate Procedure 32(a)(5) and the type-style

requirements of Federal Rule of Appellate Procedure 32(a)(6) because

this document has been prepared in a proportionally spaced typeface

using Microsoft Word 2016 in 14-point Century Schoolbook font.

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for Respondents

# ADDENDUM

Outer Continental Shelf Lands Act
> 43 U.S.C. § 1344 ............................................................... 1a

Inflation Reduction Act of 2022
> Public L. 117-169, § 50264, 136 Stat. 1818 (Aug. 16, 2022) ........................................................................ 8a

Inflation Reduction Act of 2022
> Public L. 117-169, § 50265, 136 Stat. 1818 (Aug. 16, 2022) ...................................................................... 11a

## Outer Continental Shelf Lands Act
## 43 U.S.C. § 1344—Outer Continental Shelf leasing program

### (a) Schedule of proposed oil and gas lease sales

The Secretary, pursuant to procedures set forth in subsections (c) and (d) of this section, shall prepare and periodically revise, and maintain an oil and gas leasing program to implement the policies of this subchapter. The leasing program shall consist of a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which he determines will best meet national energy needs for the five-year period following its approval or reapproval. Such leasing program shall be prepared and maintained in a manner consistent with the following principles:

(1) Management of the outer Continental Shelf shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf, and the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments.

(2) Timing and location of exploration, development, and production of oil and gas among the oil- and gas-bearing physiographic regions of the outer Continental Shelf shall be based on a consideration of—

(A) existing information concerning the geographical, geological, and ecological characteristics of such regions;

(B) an equitable sharing of developmental benefits and environmental risks among the various regions;

(C) the location of such regions with respect to, and the relative needs of, regional and national energy markets;

1a

(D) the location of such regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the outer Continental Shelf;

(E) the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

(F) laws, goals, and policies of affected States which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

(G) the relative environmental sensitivity and marine productivity of different areas of the outer Continental Shelf; and

(H) relevant environmental and predictive information for different areas of the outer Continental Shelf.

(3) The Secretary shall select the timing and location of leasing, to the maximum extent practicable, so as to obtain a proper balance between the potential for environmental damage, the potential for the discovery of oil and gas, and the potential for adverse impact on the coastal zone.

(4) Leasing activities shall be conducted to assure receipt of fair market value for the lands leased and the rights conveyed by the Federal Government.

## (b) Estimates of appropriations and staff required for management of leasing program

The leasing program shall include estimates of the appropriations and staff required to—

(1) obtain resource information and any other information needed to prepare the leasing program required by this section;

(2) analyze and interpret the exploratory data and any other information which may be compiled under the authority of this subchapter;

(3) conduct environmental studies and prepare any environmental impact statement required in accordance with this subchapter and with section 4332(2)(C) of Title 42; and

(4) supervise operations conducted pursuant to each lease in the manner necessary to assure due diligence in the exploration and development of the lease area and compliance with the requirements of applicable law and regulations, and with the terms of the lease.

**(c) Suggestions from Federal agencies and affected State and local governments; submission of proposed program to Governors of affected States and Congress; publication in Federal Register**

(1) During the preparation of any proposed leasing program under this section, the Secretary shall invite and consider suggestions for such program from any interested Federal agency, including the Attorney General, in consultation with the Federal Trade Commission, and from the Governor of any State which may become an affected State under such proposed program. The Secretary may also invite or consider any suggestions from the executive of any affected local government in such an affected State, which have been previously submitted to the Governor of such State, and from any other person.

(2) After such preparation and at least sixty days prior to publication of a proposed leasing program in the Federal Register pursuant to paragraph (3) of this subsection, the Secretary shall submit a copy of such proposed program to the Governor of each affected State for review and comment. The Governor may solicit comments from those executives of local governments in his State which he, in his discretion, determines will be affected by the proposed program. If any

comment by such Governor is received by the Secretary at least fifteen days prior to submission to the Congress pursuant to such paragraph (3) and includes a request for any modification of such proposed program, the Secretary shall reply in writing, granting or denying such request in whole or in part, or granting such request in such modified form as the Secretary considers appropriate, and stating his reasons therefor. All such correspondence between the Secretary and the Governor of any affected State, together with any additional information and data relating thereto, shall accompany such proposed program when it is submitted to the Congress.

(3) Within nine months after September 18, 1978, the Secretary shall submit a proposed leasing program to the Congress, the Attorney General, and the Governors of affected States, and shall publish such proposed program in the Federal Register. Each Governor shall, upon request, submit a copy of the proposed leasing program to the executive of any local government affected by the proposed program.

**(d) Comments by Attorney General on anticipated effect on competition; comments by State or local governments; submission of program to President and Congress; issuance of leases in accordance with program**

(1) Within ninety days after the date of publication of a proposed leasing program, the Attorney General may, after consultation with the Federal Trade Commission, submit comments on the anticipated effects of such proposed program upon competition. Any State, local government, or other person may submit comments and recommendations as to any aspect of such proposed program.

(2) At least sixty days prior to approving a proposed leasing program, the Secretary shall submit it to the President and the Congress, together with any comments received. Such submission shall indicate why any specific recommendation of

4a

the Attorney General or a State or local government was not accepted.

(3) After the leasing program has been approved by the Secretary, or after eighteen months following September 18, 1978, whichever first occurs, no lease shall be issued unless it is for an area included in the approved leasing program and unless it contains provisions consistent with the approved leasing program, except that leasing shall be permitted to continue until such program is approved and for so long thereafter as such program is under judicial or administrative review pursuant to the provisions of this subchapter.

## (e) Review, revision, and reapproval of program

The Secretary shall review the leasing program approved under this section at least once each year. He may revise and reapprove such program, at any time, and such revision and reapproval, except in the case of a revision which is not significant, shall be in the same manner as originally developed.

## (f) Procedural regulations for management of program

The Secretary shall, by regulation, establish procedures for--

(1) receipt and consideration of nominations for any area to be offered for lease or to be excluded from leasing;

(2) public notice of and participation in development of the leasing program;

(3) review by State and local governments which may be impacted by the proposed leasing;

(4) periodic consultation with State and local governments, oil and gas lessees and permittees, and representatives of other individuals or organizations engaged in activity in or on the outer Continental Shelf, including those involved in fish and shellfish recovery, and recreational activities; and

(5) consideration of the coastal zone management program being developed or administered by an affected coastal State pursuant to section 1454 or section 1455 of Title 16.

Such procedures shall be applicable to any significant revision or reapproval of the leasing program.

**(g) Information from public and private sources; confidentiality of classified or privileged data**

The Secretary may obtain from public sources, or purchase from private sources, any survey, data, report, or other information (including interpretations of such data, survey, report, or other information) which may be necessary to assist him in preparing any environmental impact statement and in making other evaluations required by this subchapter. Data of a classified nature provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. The Secretary shall maintain the confidentiality of all privileged or proprietary data or information for such period of time as is provided for in this subchapter, established by regulation, or agreed to by the parties.

**(h) Information from all Federal departments and agencies; confidentiality of privileged or proprietary information**

The heads of all Federal departments and agencies shall provide the Secretary with any nonpriviledged1 or nonproprietary information he requests to assist him in preparing the leasing program and may provide the Secretary with any privileged or proprietary information he requests to assist him in preparing the leasing program. Privileged or proprietary information provided to the Secretary under the provisions of this subsection shall remain confidential for such period of time as agreed to by the head of the department or agency from whom the information is requested. In addition, the Secretary shall utilize the existing capabilities and

6a

resources of such Federal departments and agencies by appropriate agreement.

**(i) Application**

This section shall not apply to the scheduling of any lease sale in an area of the outer Continental Shelf that is adjacent to the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, or the Commonwealth of the Northern Mariana Islands.

## Inflation Reduction Act of 2022
## Section 50264—Lease Sales under the 2017-2022 Outer Continental Shelf Leasing Program

(a) DEFINITIONS.—In this section:

(1) LEASE SALE 257.—The term "Lease Sale 257" means the lease sale numbered 257 that was approved in the Record of Decision described in the notice of availability of a record of decision issued on August 31, 2021, entitled "Gulf of Mexico, Outer Continental Shelf (OCS), Oil and Gas Lease Sale 257" (86 Fed. Reg. 50160 (September 7, 2021)), and is the subject of the final notice of sale entitled "Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257" (86 Fed. Reg. 54728 (October 4, 2021)).

(2) LEASE SALE 258.—The term "Lease Sale 258" means the lease sale numbered 258 described in the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program published on November 18, 2016, and approved by the Secretary in the Record of Decision issued on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" (82 Fed. Reg. 6643 (January 19, 2017)).

(3) LEASE SALE 259.—The term "Lease Sale 259" means the lease sale numbered 259 described in the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program published on November 18, 2016, and approved by the Secretary in the Record of Decision issued on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" (82 Fed. Reg. 6643 (January 19, 2017)).

(4) LEASE SALE 261.—The term "Lease Sale 261" means the lease sale numbered 261 described in the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program

published on November 18, 2016, and approved by the Secretary in the Record of Decision issued on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" (82 Fed. Reg. 6643 (January 19, 2017)).

(b) LEASE SALE 257 REINSTATEMENT.—

(1) ACCEPTANCE OF BIDS.—Not later 30 days after the date of enactment of this Act, the Secretary shall, without modification or delay—

(A) accept the highest valid bid for each tract or bidding unit of Lease Sale 257 for which a valid bid was received on November 17, 2021; and

(B) provide the appropriate lease form to the winning bidder to execute and return.

(2) LEASE ISSUANCE.—On receipt of an executed lease form under paragraph (1)(B) and payment of the rental for the first year, the balance of the bonus bid (unless deferred), and any required bond or security from the high bidder, the Secretary shall promptly issue to the high bidder a fully executed lease, in accordance with—

(A) the regulations in effect on the date of Lease Sale 257; and

(B) the terms and conditions of the final notice of sale entitled "Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257" (86 Fed. Reg. 54728 (October 4, 2021)).

(c) REQUIREMENT FOR LEASE SALE 258.—Notwithstanding the expiration of the 2017–2022 leasing program, not later than December 31, 2022, the Secretary shall conduct Lease Sale 258 in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final

Programmatic Environmental Impact Statement; MMAA104000" issued on January 17, 2017 (82 Fed. Reg. 6643 (January 19, 2017)).

(d) REQUIREMENT FOR LEASE SALE 259.—Notwithstanding the expiration of the 2017–2022 leasing program, not later than March 31, 2023, the Secretary shall conduct Lease Sale 259 in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" issued on January 17, 2017 (82 Fed. Reg. 6643 (January 19, 2017)).

(e) REQUIREMENT FOR LEASE SALE 261.—Notwithstanding the expiration of the 2017–2022 leasing program, not later than September 30, 2023, the Secretary shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" issued on January 17, 2017 (82 Fed. Reg. 6643 (January 19, 2017)).

## Inflation Reduction Act of 2022
## Section 50265—Ensuring Energy Security

(a) DEFINITIONS.—In this section:

    (1) FEDERAL LAND.—The term "Federal land" means public lands (as defined in section 103 of the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1702)).

    (2) OFFSHORE LEASE SALE.—The term "offshore lease sale" means an oil and gas lease sale—

        (A) that is held by the Secretary in accordance with the Outer Continental Shelf Lands Act (43 U.S.C. 1331 et seq.); and

        (B) that, if any acceptable bids have been received for any tract offered in the lease sale, results in the issuance of a lease.

    (3) ONSHORE LEASE SALE.—The term "onshore lease sale" means a quarterly oil and gas lease sale—

        (A) that is held by the Secretary in accordance with section 17 of the Mineral Leasing Act (30 U.S.C. 226); and

        (B) that, if any acceptable bids have been received for any parcel offered in the lease sale, results in the issuance of a lease.

(b) LIMITATION ON ISSUANCE OF CERTAIN LEASES OR RIGHTS-OF-WAY.—During the 10-year period beginning on the date of enactment of this Act—

    (1) the Secretary may not issue a right-of-way for wind or solar energy development on Federal land unless—

(A) an onshore lease sale has been held during the 120-day period ending on the date of the issuance of the right-of-way for wind or solar energy development; and

(B) the sum total of acres offered for lease in onshore lease sales during the 1-year period ending on the date of the issuance of the right-of-way for wind or solar energy development is not less than the lesser of—

(i) 2,000,000 acres; and

(ii) 50 percent of the acreage for which expressions of interest have been submitted for lease sales during that period; and

(2) the Secretary may not issue a lease for offshore wind development under section 8(p)(1)(C) of the Outer Continental Shelf Lands Act (43 U.S.C. 1337(p)(1)(C)) unless—

(A) an offshore lease sale has been held during the 1-year period ending on the date of the issuance of the lease for offshore wind development; and

(B) the sum total of acres offered for lease in offshore lease sales during the 1-year period ending on the date of the issuance of the lease for offshore wind development is not less than 60,000,000 acres.

(c) SAVINGS.—Except as expressly provided in paragraphs (1) and (2) of subsection (b), nothing in this section supersedes, amends, or modifies existing law.

# DECLARATION OF WALTER CRUICKSHANK

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| AMERICAN PETROLEUM INSTITUTE, et al., <br><br> *Petitioners*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR, et al., <br><br> *Respondents*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) CASE NO. 22-1222 |

### DECLARATION OF WALTER D. CRUICKSHANK

I, Walter D. Cruickshank, declare as follows:

1.        I currently serve as the Deputy Director of the Bureau of Ocean Energy Management (BOEM), in the United States Department of the Interior (Interior). I  have been employed with BOEM or its predecessor agencies for 34 years. I have served as the Deputy Director of BOEM or its predecessor agencies since 2002; I served as Acting Director of BOEM from January 2017 until February 2021. Since February 2021, I have again served as BOEM Deputy Director. I supervise BOEM offices that are responsible for the development of the

National Outer Continental Shelf (OCS) Oil and Gas Leasing Program[1] (National

OCS Program or Program) and the Bureau employees who implement these

responsibilities.

    2.      On August 26, 2022, the American Petroleum Institute (API) filed a

Petition for Review in the United States Court of Appeals for the District of

Columbia Circuit resulting in the above-captioned case. Petitioners claim that

Interior has failed to prepare and maintain a National OCS Program of lease sales

for a five-year period, which they assert is required by OCSLA. Further, Petitioners

claim there is no reason Interior cannot promptly finalize a Program, and request

that the Court compel Interior to approve a final Program no later than September

30, 2023. I am making this Declaration in support of the Brief of the Respondents.

The purpose of this Declaration is to describe: (1) the actions and steps Interior has

already taken to prepare the next National OCS Program; (2) intervening events that

affected Program development; and (3) the current timeline for Program completion.

    3.      Since the process began, development of the next National OCS

Program has been delayed by shifting priorities of the Trump Administration, the

Biden Administration's review of Program options and underlying analyses

---

[1] In the past, the National OCS Oil and Gas Leasing Program has been referred to as
the Five-Year Program. In this declaration it is referred to as either the "National
OCS Program," or "Program."

consistent with its priorities, court rulings that affected BOEM's planned

approaches for the Program and the Programmatic EIS, and Congress' enactment of

the Inflation Reduction Act (IRA) (Pub. L. 117-169 (effective August 16, 2022)).

As explained more fully below, to complete all necessary analyses, approvals, and

mandatory procedural steps, Interior requires until December 2023 to finish and

approve the next Program.

4.      Under the Outer Continental Shelf Lands Act (OCSLA, 43 U.S.C. §

1331 *et seq*.), the Secretary of the Interior (Secretary) is responsible for the

administration of energy and mineral exploration and development on the OCS.

Many of the responsibilities for implementing OCSLA have been delegated to

BOEM. These responsibilities include developing a National OCS Program;

conducting oil and gas lease sales and issuing leases on the OCS; approving

exploration and development plans under those leases; issuing geological and

geophysical (G&G) survey permits; overseeing renewable energy activities on the

OCS; and managing OCS sand, gravel, and shell resources. For BOEM lessees,

lease issuance is just the beginning of a lengthy process of exploration,

development, and production on the OCS that can last up to half a century.

5.      With regard to the National OCS Program, the Secretary is responsible

for establishing a schedule of proposed lease sales for a five-year period.  BOEM

has dedicated staff who work full time on the technical and scientific analyses

3

required for the Program. The process for developing the National OCS Program is a years-long process that involves five major steps, three public comment periods, and three analytical phases, which are shown in the graphic below.[2] The three analytical phases required to develop a new National OCS Program include issuance of the (1) Draft Proposed Program; (2) Proposed Program; and (3) Proposed Final Program. The National OCS Program development process begins with the broadest consideration of the entire OCS (all 26 OCS planning areas), and areas under consideration can be narrowed at each stage through the development process.

---

[2] Bureau of Ocean Energy Management, National OCS Program Development Process (July 2022), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/national-program/National%20OCS%20Program%20Process.PDF.



6.    At each analytical step, BOEM analyzes factors outlined in OCSLA (43 U.S.C. § 1344), including:

- existing information on geographical, geological, and ecological characteristics of regions;

- an equitable sharing of developmental benefits and environmental risks among the various regions;

- the location of regions with respect to, and the relative needs of, regional and national energy markets;

- location of regions with respect to other uses of the sea and seabed, including fisheries, navigation, existing or proposed sealanes, potential sites of deepwater ports, and other anticipated uses of the resources and space of the OCS;

- the interest of potential oil and gas producers in the development of oil and gas resources as indicated by exploration or nomination;

- laws, goals, and policies of affected States, which have been specifically identified by the Governors of such States as relevant matters for the Secretary's consideration;

- relative environmental sensitivity and marine productivity of different OCS areas; and

- relevant environmental and predictive information for different OCS areas.

7.    While some of these factors lend themselves to quantification to facilitate program areas comparison, others cannot readily be quantified, and therefore are qualitatively considered. OCSLA also requires the Secretary, when making decisions on the size, timing, and location of OCS leasing, to strike a balance among the potential for environmental damage, the discovery of oil and gas, and adverse impacts on the coastal zone. 43 U.S.C. § 1344(a)(3). To facilitate the balancing required by OCSLA, BOEM has chosen to employ National Environmental Policy Act (NEPA) procedures, and typically prepares a

6

Programmatic Environmental Impact Statement (Programmatic EIS) to inform the

Program decisions. This Programmatic EIS facilitates and informs decisions on

balancing the potential for environmental damage, discovery of oil and gas, and

adverse impact on the coastal zone.

8.    Following the OCSLA amendments in 1978, which added the

requirement for a National OCS Program, nine programs have been approved and

implemented, starting in 1980 (see Table 1).

Table 1: History of National OCS Programs

|  | **Approved Programs** |
|---|---|
| 1. | 1980-1985 |
| 2. | 1982-1987 |
| 3. | 1987-1992 |
| 4. | 1992-1997 |
| 5. | 1997-2002 |
| 6. | 2002-2007 |
| 7. | 2007-2012 |
| 8. | 2012-2017 |
| 9. | 2017-2022 |

9.    On January 17, 2017, the 2017–2022 National OCS Program was

approved by Secretary Sally Jewell, covering the five-year period from July 1,

2017, to June 30, 2022. The 2017–2022 Program scheduled 11 potential oil and gas lease sales; one in the Cook Inlet Program Area and 10 in the Gulf of Mexico Program Area. Gaps between National OCS Programs are not unprecedented. The 2007-2012 Program expired on July 1, 2012, and the 2012–2017 Program was not approved until August 27, 2012, which caused a 57-day gap between Programs.

### Development of the Next National OCS Program

10.      Changes in national and Departmental policy between 2017-2021 required Interior, including BOEM, to extensively re-evaluate various aspects of the Program, resulting in delays. On April 28, 2017, President Trump issued Executive Order 13795, which encouraged BOEM to increase energy exploration and production on the OCS. Secretarial Order 3350 (May 1, 2017), issued to implement portions of Executive Order 13795, directed BOEM to begin work on a new Program to replace the 2017–2022 Program, which had been approved five months prior. On July 3, 2017, BOEM published a Request for Information, the first public development step for a new Program. On January 4, 2018, BOEM released a Draft Proposed Program, subsequently held 23 public meetings, and solicited, analyzed, and responded to more than 2 million public comments and hundreds of direct public inquiries. The Draft Proposed Program was far more expansive than any in history, considering leasing in 98 percent of the OCS and proposing 47 lease sales in all four OCS regions, and in 25 of the 26 planning areas. Following publication

8

of the Draft Proposed Program, BOEM began preparing an expansive Proposed

Program and Draft Programmatic EIS.

11.    A March 29, 2019, District Court ruling in *League of Conservation*

*Voters v. Trump,* 363 F. Supp. 3d 1013 (D. Alaska 2019) (vacated and remanded),

843 F. App'x 937 (9th Cir. 2021), vacated parts of the Trump-era Executive Order

13795 revoking an oil and gas leasing ban in the Arctic. This district court order

caused delays in the finalization of the Proposed Program: the order had the effect

of withdrawing certain areas from consideration for leasing. Consistent with a

public statement from Secretary Bernhardt,[3] the Department paused plans to finalize

the Proposed Program while the appeal was pending in the Ninth Circuit. On

January 9, 2020, Interior instructed BOEM to restart work on the required Proposed

Program analyses, and during that time, BOEM completed necessary analyses and

updated the Proposed Program, but did not publish the Proposed Program prior to

the end of the Trump Administration's term.

12.    The Biden Administration took office on January 20, 2021, and

immediately issued policy directives that required the Department and BOEM to

_____

[3] In April 2019, Secretary Bernhardt explained to the *Wall Street Journal* that Interior would postpone work on the Program until the court ruled on the appeal, because any Program that Interior would have prepared at that stage would depend on the Ninth Circuit Court of Appeals ruling (https://www.wsj.com/articles/trumps-offshore-oil-drilling-plan-sidelined-indefinitely-11556208950).

devote substantial time to evaluate and assess the implications for the next Program. On his first day in office, President Biden issued Executive Order 13990 "Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis," instructing agencies including Interior to review all existing regulations, orders, guidance documents, and policies issued during the Trump Administration that were inconsistent with stated environmental protection, conservation, and public health commitments. Executive Order 13990 also revoked Executive Order 13795, "Implementing an America-First Offshore Energy Strategy," (April 28, 2017) issued by President Trump.

13.    Then, on January 27, 2021, President Biden issued Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad," which directs Federal agencies, including BOEM, to take certain actions to address climate change. In response to Executive Order 14008, in February 2021, BOEM focused on work to review the Federal Oil and Gas Leasing Program. BOEM and the Bureau of Safety and Environmental Enforcement formed a multi-disciplinary team to consider a range of potential reforms and recommended improvements to better align the OCS leasing process with the Biden Administration's goals and priorities. BOEM's work informed the broader Interior comprehensive review for both onshore and offshore

10

oil and gas leasing practices, which was publicly released in November 2021.[4] The review encompassed several topics related to oil and gas leasing on the OCS, including royalties and royalty relief, financial assurance, "fitness to operate" standards, and leasing practices.

14.     On April 16, 2021, Secretary Haaland issued Secretarial Order 3399, which built upon President Biden's direction in Executive Orders 13990 and 14008 (among others) and established a Departmental Climate Task Force tasked with, among other things, "implementing the review and reconsideration of Federal oil and gas leasing and permitting practices in light of the Department's broad stewardship responsibilities over the public lands and in offshore waters." This order also provided further instruction on Interior NEPA processes, with the asserted purpose of restoring transparency and integrity to the decision-making process and ensuring agency decisions appropriately consider greenhouse gas emissions and climate change impacts, including in particular the consideration of the social cost of greenhouse gases (SC-GHG) in agency analyses. In response, BOEM developed new Program analyses considering updated SC-GHG information.

---

[4] Interior published a "Report on the Federal Oil and Gas Leasing Program" on its website on November 26, 2021. (https://www.doi.gov/sites/doi/files/report-on-the-federal-oil-and-gas-leasing-program-doi-eo-14008.pdf).

15.     In September 2021, BOEM began preparing and updating the Proposed Program and Draft Programmatic EIS analyses. In January 2022, the analytical results of BOEM's work on the Proposed Program were presented to the BOEM Director, Principal Deputy Assistant Secretary for Land and Minerals Management, and the Secretary. At that time, Interior instructed BOEM to conduct further analytical refinements, prior to proceeding with publishing the Proposed Program and Draft Programmatic EIS.

16.     On February 11, 2022, in *Louisiana v. Bide*n, 585 F. Supp. 3d 840 (W.D. La. 2022), a federal district court issued a preliminary injunction barring Federal agencies from "adopting, employing, treating as binding, or relying upon" the work product of the Interagency Working Group (IWG) on SC-GHG and from using any SC-GHG estimates based on the global effects of greenhouse gases. On March 16, 2022, the Fifth Circuit Court of Appeals stayed the injunction pending an appeal. Prior to the stay being granted, BOEM was unable to advance its analysis of greenhouse gas emissions in the development of the National OCS Program, because it included the IWG's report on the SC-GHG emissions.

17.     Following the March 16, 2022, stay in *Louisiana v. Biden*, BOEM completed analytical refinements requested by Interior regarding net-zero pathways and climate change policies. In June 2022, the Secretary was briefed on the analytical results of the Proposed Program and Draft Programmatic EIS documents.

12

On June 28, 2022, the Secretary provided BOEM with her Proposed Program decision. On July 1, 2022, the 2023–2028 Proposed Program was published, along with a Draft Programmatic EIS. The publication of the Proposed Program initiated a 90-day public comment period. In August 2022, BOEM held four virtual open-house style public meetings and, in September, one oral comment public meeting to engage with stakeholders, answer questions, and hear concerns. BOEM also received more than 760,000 public comment letters during the comment period that ended on October 6, 2022. This includes detailed comments from API. BOEM has since categorized, organized, and summarized the comments it received. BOEM is still in the process of analyzing the substantive comments and must respond and address the substantive comments as it prepares the Proposed Final Program and Final Programmatic EIS.

### BOEM is Holding Lease Sales under the IRA

18.    Although there is not currently a Program in place, BOEM is conducting lease sales and issuing leases pursuant to the IRA. Prior to the passage of the IRA, pursuant to OCSLA, leases could only be issued "for an area included in the approved leasing program" 43 U.S.C. § 1344(d)(3). The IRA, however, requires BOEM to conduct certain lease sales included in the 2017–2022 Program despite the expiration of that Program. BOEM originally conducted Gulf of Mexico Lease Sale 257 in November 2021 during the 2017–2022 Program, but the U.S. District

13

Court for the District of Columbia vacated the sale in January 2022 (see *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 162 (D.D.C. 2022)). The IRA, however, directed the Secretary to accept the highest valid bids for Lease Sale 257 and to issue leases to the highest bidders by September 15, 2022. In compliance with the IRA, on September 14, 2022, BOEM accepted 307 valid bids from Lease Sale 257, resulting in 306 leases and $189,888,271 in bonuses. The IRA also directed the Secretary to conduct Cook Inlet Lease Sale 258 by December 31, 2022, Gulf of Mexico Lease Sale 259 by March 31, 2023, and Gulf of Mexico Lease Sale 261 by September 30, 2023. In compliance with the IRA, BOEM held Cook Inlet Lease Sale 258 on December 30, 2022, receiving one bid, totaling $63,983. Additionally, on February 27, 2023, BOEM published a Final Notice of Sale for Gulf of Mexico Lease Sale 259, scheduling the sale for March 29, 2023. On January 9, 2023, BOEM also finalized a Final Supplemental EIS covering Gulf of Mexico Lease Sales 259 and 261, which will inform the decisionmaker on the anticipated environmental impacts, mitigation measures, and action alternatives for each of these planned lease sales. Therefore, Interior is continuing to hold lease sales through 2023, and industry has the opportunity to bid on OCS lease blocks while the new Program is being prepared.

### Finalizing the Program: Scheduling Considerations

19.    Based on the best available data before the agency, BOEM anticipates

14

that it must, at a minimum, complete the following steps prior to issuing the next National OCS Program to ensure the Program is analytically and legally sound:

- Review more than 760,000 comments received on the Proposed Program and determine if any changes or updates to BOEM's analytical approach or discussions should be undertaken in response to the comments. While some of the comments are relatively straightforward (sometimes via form letters), BOEM also received thousands of substantive and unique comments, some of which contain complex scientific information, references to scientific studies, and critiques of, and suggestions for, BOEM's analysis and approach, which BOEM must consider. Additionally, with contractor support, BOEM will prepare summaries of comments for publication in the Proposed Final Program and Final Programmatic EIS, and responses to all substantive comments for publication in the Final Programmatic EIS.

- Incorporate information regarding impacts of the IRA into Proposed Final Program and Programmatic Environmental Impact Statement analyses related to national energy needs, energy markets, net benefits, and greenhouse gas emissions. To complete several of these analyses, BOEM must incorporate critical modeling information from the Energy Information Administration, including the Annual Energy Outlook for 2023. The 2023 Annual Energy Outlook is due to be published in March 2023.

15

- Update models necessary for BOEM to calculate offshore oil and gas leasing net benefits, greenhouse gas emissions, and impacts on air quality analyses in the Programmatic EIS.

- Consider net-zero emissions pathways. BOEM requested public comments and available datasets on this issue and received comments which are currently under review.

20. Once the Secretary makes a preliminary decision on the size, timing, and location of potential lease sales to be included in the Proposed Final Program, BOEM will prepare a summary of the preliminary decision, including an explanation of the Secretary's consideration of OCSLA factors (43 U.S.C. § 1344(a)(2)), and how she balanced the potential for environmental damage, discovery of oil and gas, and adverse impact on the coastal zone (43 U.S.C. § 1344(a)(3)).

21. Following the Secretary's preliminary decision, BOEM will begin the departmental review process for the Proposed Final Program. Due to the national level scope of National OCS Programs, analytical complexity, variety of stakeholders, and the high probability of a legal challenge, Program documents— including the upcoming Proposed Final Program—go through extensive review prior to publication. The Proposed Final Program will be reviewed consecutively by a range of BOEM experts, BOEM's Regional Directors, Interior's Solicitor's

16

Office, the Chief of BOEM's Office of Strategic Resources, BOEM's Chief

Environmental Officer, BOEM's Directorate, the Assistant Secretary for Land and

Minerals Management, the Deputy Secretary of the Interior, and finally the

Secretary.

22.    Once the approval process is complete, the Department will prepare

and publish a Notice of Availability of the Proposed Final Program and Final

Programmatic EIS in the *Federal Register.* BOEM expects to complete and publish

the Proposed Final Program in September 2023. After a mandatory 60-day waiting

period, 43 U.S.C. § 1344(d)(2), the Secretary may approve the new Program.

23.    Due to additional, necessary work on the Proposed Final Program,

including incorporation of critical information from the Energy Information

Administration and completion of necessary analyses, a final Interior Department

review, and the statutory 60-day waiting period following submission of the

Proposed Final Program to the President and Congress, Interior needs until

December 2023 to approve the next Program. Interior expects that the Secretary will

approve the next Program in December 2023.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this 6th day of March 2023, in Washington, D.C.

WALTER CRUICKSHANK
Digitally signed by WALTER CRUICKSHANK
Date: 2023.03.06 14:43:04 -05'00'

WALTER D. CRUICKSHANK
Deputy Director
Bureau of Ocean Energy Management
U.S. Department of the Interior